# EXHIBIT A



TRANSLATION CERTIFICATION

Arriva Translations certifies that the attached document listed below has been translated by a skilled and qualified translator. Further, Arriva Translations has no involvement or interest in this matter other than providing an accurate translation.

| | |
|---|---|
| Document Title | English Translation of -Invest agreement |
| Summary/Description | Certified Chinese to English Translation of - Invest agreement |
| Number of Documents | 1 |
| Originating Language | Chinese |
| Translator | Richard Peng |
| Date | 03-20-2023 |
| Project Manager | Liz Smith |



**12636 High Bluff Drive, Suite 400, San Diego, CA 92130 ● 888-940-3030**
www.arrivatranslations.com

Joint Venture Contract


Entered into by and between

Mr. MENG Xiabin

(Party A)

And

Zhejiang Juhua Co., Ltd.

(Party B)


February 28, 2018

# Table of Content

1.   Definition and Interpretation ……………………………………………………   2

2.   The Parties to the Joint Venture Company …………………………………....   6

3.   Establishment of the Joint Venture …………………………………………….   6

4.   Purpose, Goals Business Scope and Term of the Joint Venture ……………......   7

5.   Total Investment and Equity Capital ……………………………………….........   8

6.   Certificates and Licenses…………………………………………………......   12

7.   Responsibilities and Obligations of the Parties ………………………………...   12

8.   Shareholders' Meeting …………………………………………………………   14

9.   Board of Directors ……………………………………………………………..   16

10.  Operation and Management ……………………………………………………   18

11.  Marketing, Sales and Purchasing ……………………………………………….   19

12.  Non-Competition, Non-Solicitation and Non-Disparagement ……………………   21

13.  Technology and Intellectual Property ………………………………………….   21

14.  Labor Management ……………………………………………………………..   22

15.  Finance and Accounting ……………………………………………………….   23

16.  Other Rights of Party B ……………………………………………………….   24

17.  Representations and Warranties ……………………………………………….   24

18.  Termination, Dissolution and Liquidation …………………………………….   25

19.  Breach of Contract …………………………………………………………….   28

20.  Obligation of Confidentiality …………………………………………………   28

21.  Force Majeure ………………………………………………………………….   29

22.  Settlement of Disputes …………………………………………………………   30

23.  Miscellaneous  …………………………………………………………………   31

## Joint Venture Contract

This Joint Venture Contract (hereinafter referred to as "Contract") is entered into betweeb and by the following two parties in Quzhou, Zhejiang Province on February 28, 2018:

(1) Mr. MENG Xianbin, a U.S. resident, Passport Number is P503981640, his Address is 5814 Mariner Street, Tampa, FL 33609, USA (hereinafter referred to as "Party A"); and

(2) Zhejiang Juhua Co., Ltd., a corporation established under Chinese Law, its registered address is Kecheng District, Quzhou City, Zhejiang Province (hereinafter referred to as "Party B")

Party A and Party B are hereinafter individually referred to as a "Party" and collectively referred to as the "Parties".

## Preamble

The parties hope to establish a joint venture business ("Joint Venture Company or Company") in Florida to produce and operate refrigerants and other related products.

The parties intend to agree on the establishment, business development and daily operation management of the company according to the terms of this contract and cooperate accordingly.

After friendly negotiation, in accordance with the principles of equality and mutual benefit, and in compliance with applicable laws, the parties agree to the following terms:

## 1. Definition and Interpretation

1.1.  Definition

Unless otherwise indicated in the terms of this contract or the context, the following terms shall have the following meanings:

Affiliate  means any person or legal entity that is directly or indirectly controlled by a party, is under common control with that party, or controls that party; "Control" means the right to direct the management of a company, or the power to effect directions, whether by contract, voting share or otherwise. In order to avoid ambiguity, any natural person's spouse, immediate family members and the spouse's immediate family members are affiliates of the natural person.

2

For the purposes of this contract, affiliates not only include BMP, but also T.T International company.

| | |
|---|---|
| Governing Law | refers to the laws, regulations, rules applicable to a party to this contract or the subject matter of this contract, as well as notices, orders, decisions or other public documents issued by legislative, administrative or judicial organs. |
| Good Professional Standards | means the values, codes of conduct and norms formulated by the board of directors, which must be followed in the professional activities of the board of directors and executives, and in line with the professional characteristics of directors and executives. |
| Registration Authority | means the competent authority that has the authority to accept applications for the establishment and modification of joint venture companies and legally register documents (if necessary). |
| Articles of Association | means the articles of association of the joint venture company signed by both parties on the same day as the signing date of this contract. |
| Competent Authority | means any branch of government, including the executive, judicial, or legislative branches of government or a department, commission, agency, exclusionary body, or other authorized entity of government. |
| Workday | means: |

(a) With respect to any act performed in the United States, it means any day on which companies in the United States are generally open for business, including Saturdays or Sundays declared by the U.S. Government to be temporary workdays ("Scheduled Workdays"), but excludes statutory holidays and Saturdays or Sundays other than scheduled workdays;

(b) With respect to any acts performed in any other country or region outside of the United States, it means any day on which companies conduct normal business operations in the applicable jurisdiction.

| | |
|---|---|
| Business Plan | means the general business plan of the Joint Venture as approved by the board of directors of the company from time to time. |
| Joint Venture Company or Company | means a joint venture company to be named "iGasUSA Inc.", to be established by the parties in accordance with this contract and the articles of association of the company. |
| Confidential | means any business, market, technical, operational or other relevant |

| | |
|---|---|
| Information | information of either party (and its affilates) or the joint venture. At the time of disclosure, such information is designated (or similarly designated) as confidential, disclosed in a confidential environment, or will be deemed confidential by the parties on a reasonable commercial basis, including in particular trade secrets as defined below. |
| Board Directors | members of the company's board of directors appointed from time to time by the shareholders of the joint venture company. |
| Equity or Shares | means all legal and economic rights and interests attached to the company's equity capital in accordance with the local applicable laws of the company's establishment, this contract and the company's articles of association. |
| Certificates and Licenses | mean any approval, registration, filing, consent, notarization, certification, permission, authorization or waiver related to the establishment, operation or assets of the joint venture company issued by any competent authority within a limited period of time (whether it is an express action or should be deemed to be given despite no action). |
| China | means the People's Republic of China, and for the purpose of this contract, excludes the regions of Hong Kong, Macau and Taiwan. |
| Trade Secret | means any technical information and business information that is not known to the public, can bring economic benefits to the right holder, and is practical and subject to confidentiality measures taken by the right holder. |
| Executive | means the chief executive officer, sales director, financial director, human resources director and production director of the joint venture company. |
| Intellectual Property | means any intellectual property in any jurisdiction worldwide, including (i) patents, patent applications, discoveries and inventions; (ii) trademarks, service marks, trade dress, trade names, business names or domain names, together with all goodwill associated therewith; (iii) copyright; (iv) registration and application for registration of any of the foregoing; (v) computer software; and (vi) confidential information, including know-how and trade secrets. |

| | |
|---|---|
| Target Product | means refrigerants and related products (including foaming agents, propellants, medical aerosols, cleaning agents, fire extinguishing agents and other similar products). |
| Target Business | means research and development, production, procurement, storage, transportation and sales (agent or distribution) of target products. |
| BMP | means BMP International, Inc. and/or BMP USA, Inc. |

1.2.    Interpretation

Any applicable law, regulation or any other legal document referenced to in this contract, or any provision thereunder, including its revised version from time to time.

1.2.1   "Person" referenced to in this contract shall include, depending on the context, any individual or entity (including any company, firm or other business or entity, joint venture, agency, state or government department).

The titles of the various sections in this contract are provided for the convenience of reference only, and have no effect on the understanding or interpretation of this contract.

Any party referenced to in this contract or to any contract, agreement or document includes such party's successors and permitted assigns.

1.2.2   In this contract, "including" shall have the meaning of "including but not limited to".

**2.      The Parties to the Joint Venture**

(a)     Party A: MENG Xianbin
Nationality: U.S.A.
(b)     Party B: Zhejiang Juhua Co., Ltd.
Party B's Legal Representative or Authorized Representative: Lei Jun
Position: General Manager
Nationality: China

**3.      Establishment of the Joint Venture Company**

3.1     The parties hereby agree to draft the articles of association of the joint venture company in accordance with the applicable laws and regulations and the stipulations of this contract. In the event of any inconsistency or conflict between the provisions of this contract and the articles of association of the company, the provisions of this

5

contract shall prevail, and both parties shall revise the articles of association of the company to make them consistent with the provisions of this contract; except for the mandatory provisions of the law of the place where the joint venture company is established.

3.2    Company Name

The company name shall be: iGas USA Inc.

3.3    The Registered Address of the Company

The registered address of the company shall be: 8105 Anderson Road, Tampa, FL 33634

3.4    C Corporation

The organization form of the joint venture company shall be a C Corporation organized under the laws of the State of Florida. Either party shall be liable for the joint venture company only to the extent of the shares formed by the subscribed capital contribution. The joint venture company shall be liable for the debts of the company with all its assets.

3.5    Governing Law

The joint venture company is a legal person legally organized under the laws of the State of Florida. The joint venture company is governed and protected by the relevant laws of Florida, USA. All actions and activities of the joint venture must comply with the relevant laws of Florida, USA.

3.6    Certificates and Licenses Required for the Establishment and Operation of the Company

The following permits or approvals related to the establishment of the company and the operation of the joint venture company shall be obtained within the specified time limit:

(i)    Approval or filing in China, the United States and other relevant jurisdictions for the establishment of the joint venture company shall be obtained before the establishment of the company;

(ii)    According to the applicable laws of the United States, the licenses required for the operation of the joint venture company shall be obtained within 30 days after the establishment of the company.

**4.  Purpose, Goal, Business Scope and Term of the Joint Venture**

4.1   Joint Venture Purpose

The purpose of the establishment of the joint venture company is based on Party A's rich sales experience and capabilities in the U.S. refrigerant and related industries, its deep insight into and ability to grasp industry trends, its established customer groups and sales channels with a wide range of coverage, and its preliminarily completed mixing facilities and logistics system. It is also based on Party B's strong technical background and team in refrigerant and related industries, excellent industrial chain advantages and production and operation capabilities, sufficient production capacity guarantee capabilities, and good cost control capabilities.   The parties make strong alliance to further enhance their competitiveness and create good economic benefits in the U.S. refrigerant market.

4.2   Joint Venture Company Goal

The goal of the joint venture company is to maximize the advantages of both parties in terms of industry and sales, and after several years of rapid development and expansion, the company will be listed in the US market, be acquired by Party B or its affiliates, or be acquired by a third party at a premium, so as to maximize the interests of shareholders.

4.3   Business Scope

The business scope of the joint venture company includes: production, procurement, mixing, storage, transportation and sales of refrigerants and related products (including foaming agents, propellants, medical aerosols, cleaning agents, fire extinguishing agents and other similar products).

4.4   Business Plan

The business plan of the joint venture company shall be determined by the board of directors after considering the actual situation of the market, the ability of employees and other factors that the board of directors consider important. The business plan may be expanded or reduced by the board of directors from time to time according to market conditions and other relevant circumstances.

4.5   Independent Entity

As an independent economic entity, the joint venture company operates and conducts business independently.

4.6   Term of Joint Venture

Unless otherwise negotiated and determined by the parties, the joint venture term of the joint venture company ("JV Term") shall be twenty years, commencing from the date of establishment of the joint venture company.

5. **Total Investment and Equity Capital**

5.1     Total Investment

The total investment of the company shall be: USD$29,411,765 (in words: Twenty-nine million four hundred eleven thousand seven hundred sixty-five U.S. dollars).

5.2     Equity Capital

The equity capital of the company ("Equity Capital") shall be: USD$29,411,765 (in words: Twenty-nine million four hundred eleven thousand seven hundred sixty-five U.S. dollars), and the number of shares to be issued shall be 29,411,765 shares, all of which are common stock, and the value per share shall be USD$1.00.

5.3     Capital Contribution

(a) The capital contribution to be subscribed by Party A shall be USD $19,411,765 (in words: Nineteen million four hundred eleven thousand seven hundred sixty-five dollars U.S. dollars), holding 19,411,765 (in words: Nineteen million four hundred eleven thousand seven hundred sixty-five) shares to be issued by the joint venture company, accounting for about sixty-six percent (66%) of the equity capital of the joint venture company , all shall be paid in cash on the date of establishment of the company.

(b) The capital contribution to be subscribed by Party B shall be USD $10,000,000 (in words: ten million U.S. dollars), holding 10,000,000 (in words: ten million) shares to be issued by the joint venture company, accounting for about 34% of the equity capital of the joint venture company (34%), all shall be paid in cash on the date of establishment of the company.

5.4 Proof of Capital Contribution

After the approval of the board of directors, the company shall issue certificates of equity to prove the number of shares corresponding to the capital contribution of the parties. The specific content of the certificate of equity shall be clearly set forth in the company's articles of association.

5.5 Equity Transfer

5.5.1   Unless otherwise expressly stipulated in this contract, without the prior written consent of the other party, neither party shall sell, transfer, gift or otherwise dispose of its equity of the joint venture company to a third party before December 31, 2022 ("lock-up period"). After the lock-up period, both parties agree not to directly or indirectly sell, transfer or dispose of their shares in any other way, except for the transfer stipulated in Section 5.5. Any disposition in violation of this section and other requirements of this contract shall be void.
For the avoidance of any ambiguity, the provision of Section 5.5.4 shall not be subject to the lock- up period.

5.5.2 Right of First Refusal

(a) Restrictions. Pursuant to this Section 5.5.2, neither party shall sell, transfer or otherwise dispose of (whether voluntarily or by operation of contract or law) its shares unless it has received a bona fide written offer ("Offer") to purchase the shares for sale ("Share for Sale") from a third party (the "Purchaser"), which has established the purchase price and is priced in U.S. dollars in accordance with specific terms and conditions; the offer shall be validly signed by the purchaser and shall be irrevocable within 90 days after the expiration of the offer period (see definition below). Before the offer is accepted, the party selling shares must first make an offer in writing to the company (and other shareholders identified in this contract) at the same price and terms and conditions as the offer.

(b) Disclosure. The party transferring shares shall disclose the terms and conditions of the above-mentioned offer and the identity of the offeror to the company and other shareholders, including the number of shares to be acquired and the price per share and the total consideration, and shall make an offer notice to transfer its shares for sale in writing to the company and other shareholders on the same terms and conditions ("Offer Notice"), which shall be deemed irrevocable, for a period of ninety (90) days after such offer notice is served to the Company ("Offer Period"). After receiving the offer notice, the company shall decide whether to accept the offer of all or part of the shares for sale within sixty (60) days (the "Initial Offer Period") and submit corresponding performance.

(c) Shareholder Rights. If the company does not accept the offer to purchase all or part of the shares for sale before the expiration of the first offer period, other shareholders shall have the right to decide whether to accept the offer, and purchase all the shares that the company has not accepted to purchase in accordance with the determined price and terms and conditions. Other shareholders shall submit to the company within thirty (30) days after the expiry of the first offer period (the "Second Offer Period") whether to accept the offer and perform accordingly. If the company and/or other shareholders do not choose to purchase all of the shares for before the expiration of the offer period, the offer shall be deemed rejected.

(d) <u>Proportional Rights</u>. If more than one shareholder accepts the offer, each shareholder shall have the right to determine the purchase ratio in proportion to its shareholding.

(e) <u>Closing of Purchase of Shares for Sale</u>. If the company and/or other shareholders accept the offer and purchase all shares for, closing of the shares for sale shall be completed within ninety (90) days of the purchase of the offer, or if later, on the closing date specified in the offer. The party transferring the shares, the company and all transferee shareholders shall execute the necessary and appropriate documents and papers in accordance with the terms of the offer and the provisions of this Section 5.5.2 to complete the purchase of the shares for sale. The consideration for the purchase and sale of the shares shall be payable in accordance with Section 5.5.4 (b).

(f) <u>Transfer</u>. If at the end of the offer period, the company and /or other shareholders do not accept the offer to purchase all the shares for sale, and if the tag-along right (as defined below) is triggered, the other shareholders do not exercise the tag-along right stipulated in Section 5.5.5, then the party who transfers the shares can freely sell, transfer or otherwise dispose of the shares for sale to a specific buyer according to the offer price and terms and conditions within ninety (90) days after the expiration of the offer period , subject to the conditions specified in the Section 17 of this contract. After the expiration of said ninety (90) day period, the share for sale shall again be subject to the provisions of this Section 5.5.2.

5.5.3   <u>Waiver of Restrictions</u>. Notwithstanding anything to the contrary, a party may transfer its shares with the prior written consent of the company and all shareholders.

5.5.4 <u>Mandatory Transfer</u>

(a)   <u>Transfer Event</u>. For the purposes of this contract, any of the following events shall constitute a "Transfer Event":

(i)   Party A is terminated as an executive of the company or stops providing services to the company or expresses the intention to stop services in other ways or for any reason;

(ii)   The company has sustained losses consecutively for three years or more;

(iii)   The shareholder becomes bankrupt or the shareholder intends to make an assignment for the benefit of creditors, or a bankruptcy petition is filed by or against the shareholder, or a receiver is appointed for the shareholder; or

(iv)   Failure to pass a resolution on the same matter at the company's shareholders' meeting or by the board of directors for six consecutive months which will have a significant negative impact on the business, assets or operations of the joint venture company, and cannot be resolved through high-level negotiations between the shareholders.

Party B may notify Party A by sending a written notice ("Offer Notice") to Party A (or its spouse or authorized representative (as the case may be)) after the occurrence

of the above-mentioned transfer event, requesting it to purchase all shares of Party B ("Transfer Offer"). Within forty-five (45) days of receipt of the offer notice ("Offer Period"), Party A (or its spouse or authorized representative (as the case may be)) shall notify Party B of its decision whether to accept the transfer offer. If Party A (or its spouse or authorized representative (as the case may be)) accepts the transfer offer, both parties shall use their best efforts to complete the equity transfer as soon as possible, and the price payable for Party B's equity to be purchased by Party A (or its spouse or authorized representative (as the case may be)) shall be the fair market price determined by the company's certified public accountants in accordance with the international general accounting standards.

If Party A (or its spouse or authorized representative (as the case may be)) refuses to accept the transfer offer or Party A fails to respond within thirty (30) days of receiving the offer notice, both parties shall be subject to Section 17.1 of this contract.

(b) <u>Payment Method</u>. Unless otherwise specified in this contract, the transfer price determined in accordance with the above clause 5.5.4 (a) shall be paid in full by cash within thirty working days (30) after the expiration of the offer period.

5.5.5 <u>Tag-along Right</u>. If Party A intends to transfer most of the shares held by it ("Transfer"), Party A shall send a written notice to Party B ("Transfer Notice") no less than thirty (30) days before the expected closing date of the transfer. The transfer notice shall include: (i) the number of shares that Party A intends to transfer; (ii) the main conditions of the transfer (including the price at which such shares are to be transferred) and the identity information of the intended transferee; and (iii) the proportion of the number of shares to be transferred to the total shares held by Party A. After receiving the transfer notice, Party B shall have the right to transfer its shares to the intended transferee in the same proportion (or less than the proportion) of the shares that Party A intends to transfer ("Tag-along Right").

(a) Within ten (10) days from the service of the transfer notice, Party B shall serve a written notice to Party A that it chooses to transfer all or part of its shares ("Selection Notice"), and the number of shares to be transferred shall not exceed (x) the number of shares that Party A intends to transfer/the fraction of the total number of shares held by Party A multiplied by (y) the total number of shares of the joint venture company held by Party B before the transfer. This selection shall be irrevocable and both parties shall act and sign the necessary documents to complete the transfer as soon as possible.

(b) If the transferee who intends to receive the shares offered refuses to transfer the accompanying sale shares according to this contract, Party A shall not sell the shares it intends to transfer to the transferee.

(c) For the avoidance of ambiguity, Party B shall not: (i) exercise the tag-along right when transferring to the company; or (ii) exercise the tag-along right when transferring equity in accordance with Section 5.5.4 of this contract.

11

6.      **Certificates and Licenses**

6.1     Certificates and Licenses Required for Operation

Party A shall be responsible for timely handling all application or approval procedures related to the certificates and licenses required for the operation of the joint venture company stipulated in Section 3.6 (except those which shall be handled by Party B by itself under (i)), and all government fees thus incurred shall be borne by the joint venture company. Party B shall provide all necessary assistance in a timely manner which shall not be unreasonably refused or delayed.

6.2     Maintenance of Validity of Certificates and Licenses

The parties shall urge the joint venture company to take all necessary measures and implement all necessary actions throughout the joint venture period to maintain the validity of all certificates and licenses obtained by the joint venture company related to its establishment, corporate form, valid existence and business conduct.

7.      **Responsibilities and Obligations of the Parties**

7.1     Responsibilities and Obligations of Party A

In addition to performing its other obligations under this contract, Party A shall also be responsible for the following matters:

(a) Assist the joint venture company to obtain all certificates and licenses, and submit the relevant certificate and license documents obtained from the competent authority to Party B and the joint venture company without delay;

(b) Assist the joint venture company to contact the relevant US authorities;

(c) From the date of the establishment of the joint venture company, except that it is allowed to start selling and disposing of the inventory related to the target product under its name or the name of the affiliate within a period of no more than 6 months (excluding empty steel cylinders and the special mixed products BMP developed for customers), it shall immediately stop and ensure that its affiliates stop engaging in the target business, and all such businesses shall be transferred to the joint venture company for operation. Party A and its affiliates shall not engage in business related to refrigerants and similar products outside the joint venture company through a new establishment, arrangement by agreement or otherwise. After the establishment of the joint venture company, Party A shall, in principle, first sell and process the inventory of Party A's affiliates. With the upgrading of the applications of refrigerants, etc., substitutes for the above products and businesses shall also be operated in the joint venture

12

company to maintain the long-term operation and development of the joint venture company;

(d) Inject intangible assets such as customers, channels, brands, and teams of its original target products into the joint venture company;

(e) After the establishment of the joint venture company, lease all tangible assets related to refrigerant distribution (including land, plants, vehicles and equipment) under the name of it or its affiliates (for the sake of this section, excluding T.T. International) to the joint venture company at fair market prices and conditions;

(f) At an appropriate time after the establishment of the joint venture company, sell the above-mentioned tangible assets and the remaining empty steel cylinders under the name of it or its affiliates (for the sake of this article, excluding T.T. International) to the joint venture company at a fair market price and conditions, and assist in handling various transfer procedures to ensure that the joint venture company legally owns the above-mentioned tangible assets; and

(g) Handle other matters entrusted by the joint venture company from time to time according to the written agreement signed separately with the joint venture company.

7.2    Responsibilities of Party B

In addition to performing its other obligations under this contract, Party B shall also be responsible for the following matters:

(a) Provide the joint venture company with priority product guarantees, price concessions and other supports (preferential methods shall be negotiated separately);

(b) Actively carry out the work of overseas construction of production plants separately established as the main body by both parties, the joint venture company or the shareholders; Party B shall provide production technology and authorization licenses for the operation of HFC-134a, HFC-32 and HFC-125 production plants overseas, and building the operating team (the team's salaries shall be paid by the invested entity itself), and provide financing to the subject of overseas installations on the premise that the invested subject meets the financing conditions; Party B shall also provide necessary technical support for the sub-packaging and distribution of the joint venture company in the United States;

(c) Assist the joint venture company in purchasing equipment, instruments, raw materials and services in China (if necessary);

(d) Agree and urge the joint venture company to lease and be transferred all the tangible assets related to refrigerant distribution and the remaining empty cylinders under the name of Party A or its affiliates (for the purpose of this section, excluding T.T. International) at fair market prices and conditions; agree

13

that the joint venture company shall carry out the acquisition of vehicles and equipment within half a year; and

(e) Handle other matters entrusted by the joint venture company from time to time according to the written agreement signed separately with the joint venture company.

## 8.   **Shareholders' Meeting**

8.1    Ordinary Resolutions

The following matters shall be passed by ordinary resolutions of shareholders of the joint venture company:

(a) Review and approve the report of the board of directors;

(b) Review and approve the annual financial budget plan and financial settlement plan of the joint venture company;

(c) Any mortgage, guarantee, lien or encumbrance placed on the assets of the joint venture company for the business activities of the joint venture company with a security amount not exceeding US$1 million;

(d) A single transaction between the joint venture company and any shareholder, director or other affiliate shall not exceed USD 300,000 and the annual transaction volume shall not exceed USD 1 million;

(e) Purchase of fixed assets that are needed solely for the company's operating shall not exceed USD 500,000 in a single transaction; and disposals of fixed assets that shall not exceed USD 500,000 in the annual transaction volume and not exceed USD 100,000 in a single transaction.

8.2    Unless the law has a mandatory requirement for a higher percentage of voting rights, ordinary resolutions of the shareholders' meeting shall be deemed to have been approved by the shareholders' meeting after being agreed by shareholders holding more than 51% of the voting rights of the joint venture company.

8.3    High-level Resolution

The following matters shall be passed by the shareholders' meeting of the joint venture company in the form of a high-level resolution:

(a) Any modification of the articles of association of the joint venture company;

(b) Decision on the joint venture company's operating policy, external equity investment, business plan and financing plan;

(c) Any increase/decrease in the share capital of the joint venture company, spin-off, reorganization, overall transfer or change of the company form of the joint venture company after the establishment of the joint venture company;

14

(d) The decision to take relevant actions for liquidation or dissolution of the joint venture company in accordance with relevant laws and regulations or the stipulation of this contract;

(e) For the business activities of the joint venture company, set up any mortgage, guarantee, lien or encumbrance on the assets of the joint venture company with a guarantee amount exceeding US$1 million, or provide any form of external guarantee for a third party;

(f) A single purchase transaction of fixed assets exceeding USD 500,000;

(g) Sell or dispose of assets owned or actually owned by the joint venture company that exceed US$ [10] million in single transaction or US$ 500,000 in cumulative annual transaction volume;

(h) Review and approve the joint venture's profit distribution plan and loss recovery plan;

(i) A single transaction between the joint venture company and any shareholder, director or other affiliate that exceeds US$300,000 or the cumulative annual transaction amount exceeds US$1 million, except for affiliate transactions determined through public bidding procedures;

(j) Providing loans to third parties;

(k) The joint venture company intends to raise funds by issuing bonds or initial public offering of shares in the securities market;

(l) Review and approve the annual assessment plan and assessment results of the management of the joint venture company;

(m)   Appoint or dismiss the auditors and board directors of the joint venture company, and decide on their remuneration;

(n) The assessment system and reward and punishment system for the company's executives;

(f) The joint venture company establishes branches for its business needs; and

(g) Employee option incentive program.

8.4   Unless the law has mandatory requirements for a higher percentage of voting rights, the high-level resolutions of the shareholders' meeting shall be deemed approved by the shareholders' meeting after being agreed by shareholders holding 70% or more of the voting rights of the joint venture company.

8.5   Convocation of Shareholders' Meeting

The shareholders' meeting shall be convened and presided over by the chairman of the board as the chairman of the meeting. The shareholders' meeting shall be held at least once a year, and the annual shareholders' meeting shall be held within three months after the audit of the financial report of the joint venture company. The first shareholders' meeting shall be convened and presided over by the shareholder who holds the most shares of the company. Shareholders may appoint others to attend the shareholders' meeting on their behalf by means of written authorization.

Quorum for the resolution of the shareholders' meeting: Unless the law has a higher mandatory requirement for the quorum, in terms of ordinary resolutions, the quorum of the shareholders' meeting shall be the shareholders present at the meeting holding no less than 70% of the shares issued at the time.

8.6   Written Resolutions and Conference Calls

Subject to the provisions of applicable laws, the articles of association of the joint venture company shall provide that the shareholders may pass valid and binding resolutions without a convening a shareholders' meeting (for Sections 8.1 (Ordinary Resolutions) and 8.3 (High-level Resolutions) of this contract), the prerequisite is that (i) the proposal to vote by way of written circulation or by convening a meeting shall be approved by the chairman of the board; (ii) applicable only to matters passed by ordinary resolutions at the shareholders' meeting; (iii) All shareholders agree in writing to the resolution. Meetings can also be called and held legally by telephone, and the voting mechanism for conference calls shall be set forth in the company's articles of association.

9.   **Board of Directors**

9.1   Establishment of the Board of Directors

The joint venture company shall have a board of directors consisting of three (3) directors, of which two (2) directors shall be appointed by Party A and one (1) director shall be appointed by Party B. The overall control and management of the company's business rests with the company's board of directors.

Each director has a term of three (3) years and can be re-appointed by the original appointing party. A party reserves the right at its sole discretion to replace any director appointed by it. If a director becomes vacant due to retirement, resignation, illness, incapacity or death, or removal, the party who originally appointed the director shall appoint a successor director for the remaining time of the director's term of office.

The chairman of the board shall be a director appointed by Party A. The chairman shall be the legal representative of the company. When the chairman is unable to perform his duties for any reason, the chairman shall designate an authorized representative among the directors to temporarily perform his duties in accordance with the provisions of this contract and the company's articles of association.

The director appointed by one party must be an individual with integrity, honesty, and corresponding work experience. Directors shall comply with relevant laws and

16

regulations on qualifications of directors. The party appointing a director shall notify the other party in writing when appointing or removing a director. At the time of signing this contract, both parties shall notify the other party in writing of the name, position and nationality of the initial director appointed by the party. A brief biography and qualifications of each new director candidate shall also be attached to the appointment notice. The secretary of the board of directors shall record the appointment or removal of directors in the company's register.

Directors shall not be personally liable for acts performed in good faith in the course of their duties or in the execution of tasks assigned to them by the board of directors, except when such acts constitute willful misconduct, violations of relevant laws, the articles of association and/or violations of good professional standards.

9.2    Powers of the Board of Directors

The board of directors shall have the right to decide all matters related to the company, except Section 8.1 of this contract (matters that must be decided by ordinary resolutions of shareholders) and Section 8.3 (matters that require shareholders to vote and approve a high-level resolutions) that require shareholders to decide matters.

9.3    Convening and Voting of Board Meetings

The board meeting shall be held every three months and may be held in various forms.

Where the number of attendees (including attendance via video) reaches 2/3 of the total number of board members and includes at least 1 director of Party A and 1 director of Party B, the requirement for the legal quorum of the board meeting is met. If the legal number requirements are not met within 1 hour after the meeting time notified by the board meeting, the meeting shall be postponed for 7 days, and the second meeting still requires at least 1 director of Party A and 1 director of Party B to meet the legal requirements. number of people.

When the chairman is unable to call a meeting, or any director is unable to attend a meeting, he/she may appoint a member of the board of directors to act as his/her proxy. A proxy's vote will be treated as its own vote. For the avoidance of any doubt, there is no restriction on a director performing the acts of one or more directors' proxies at the same time as applicable.

Unless the law requires a higher percentage of voting rights, resolutions of the board of directors shall be approved by all participating directors.

9.4     Written Resolutions and Conference Calls

Subject to the provisions of applicable laws, the articles of association of the joint venture company shall stipulate that the board of directors may not pass a written resolution, provided that (i) the proposal to vote by circular in writing or by calling a meeting shall be approved by the chairman of the board of directors; (ii) All directors agree in writing to pass the resolution. Meetings can also be called and held legally by telephone, and the voting mechanism for conference calls will be stipulated in the company's articles of association.

10.     **Operation and Management**

10.1    Management System

The management system adopted by the joint venture company is that the chairman of the board reports to the board of directors and works under the supervision of the board of directors, and other executives report to the chairman of the board and work under the supervision of the chairman. Under the leadership and control of the board of directors, the chairman shall supervise and control all assets, businesses and matters of the company.

10.2    Executives and Managers

Managers shall be upright and honest, and have corresponding professional qualifications and experience. The first chairman of the board shall be nominated by Party A, and the executives shall be chief executive officer (CEO), sales director, financial director, human resources director, and production director. CEO shall be concurrently served by the chairman, with a term of four (4) years, and may be re-elected. The managers are appointed by the company are secretary and cashier, all of whom are appointed by the board of directors. The opinions of the other party shall be fully taken into consideration when the two parties nominate or remove relevant executives.

The chairman of the board shall seek advice from the directors on major decisions. The director shall assist the chairman in carrying out his work as required by the chairman. The chairman and the directors shall perform their respective duties full-time, and shall not concurrently serve as the chairman or director in any other economic entity, except for the nominal positions held by the joint venture company or its affiliates that have been clearly reported to the board of directors of the joint venture company.

10.3    Responsibilities of the Chairman

The chairman shall be responsible for the implementation of the resolutions of the board of directors, as well as the daily operation and management of the joint venture company. The chairman shall be accountable to the board of directors and perform his duties in accordance with the powers vested in him by the board of directors. The chairman of the board shall have the right to hire and dismiss other employees except the executives of the joint venture company, and designate specific personnel to regularly report to the shareholders' designated personnel on the company's operating conditions. The chairman has the power to decide the internal operating structure of the joint venture company and shall assign appropriate department managers/directors to be responsible for the work of their respective departments. Other executives and the above-mentioned designated directors shall report to the chairman and work under his supervision and leadership. All purchase orders, invoices, contracts, agreements and other business and legal documents binding on the joint venture company shall be approved and signed according to the authorization system.

11. **Marketing, Sales and Purchasing**

11.1   Quotas

If the U.S. implements a quota system for HFCs products in the future, Party A and its affiliates shall obtain the HFCs product quotas for the accumulated sales volume before the establishment of the joint venture company. After the establishment of the joint venture company, the joint venture company shall obtain the HFCs product quotas for the accumulated sales volume in the name of the joint venture company. The joint venture company shall give priority to using the quota owned by the joint venture company in its operation, and the quota of Party A and its affiliates may be used only after the quota of the joint venture company is exhausted. When the quota of Party A and its affiliates exceeds the normal sales demand of the joint venture company in the current year, the two parties shall discuss whether the joint venture company will establish an inventory for the remaining quota of Party A and its affiliates in the current year. If Party B does not agree to establish an inventory, Party A and its affiliates can build an inventory within its remaining quota range by themselves, but should there be business conflicts with the joint venture company in accordance with the provisions of this contract in the future because of its own inventory building. both parties need to negotiate and resolve it separately. The affiliate of Party A shall give priority to purchase the products of Party B when using the quota.

11.2   Utilization of Other Assets

After the establishment of the joint venture company, the joint venture company shall lease all the tangible assets related to the distribution of refrigerants (including

land, factory buildings, vehicles and equipment, etc.) under the name of Party A or its affiliates (for the purpose of this section, not including T.T. International) at a fair market price and conditions;

At an appropriate time after the establishment of the joint venture company, the joint venture company shall purchase the above tangible assets and empty steel cylinders under the name of Party A or its affiliates at a fair market price and conditions.

1 1.3   Marketing and Sales Policy

The chairman of the board shall be responsible for formulating the marketing policies and strategies of the joint venture company and submit them to the board of directors for approval. All marketing activities of the joint venture company shall be conducted in accordance with the above approved marketing policies and strategies.

1 1.4   Markets for Products and Services of the Joint Venture Company

The joint venture company may sell its products and provide related services in the United States and in the international market.

1 1.5   Purchasing Policy

The joint venture company shall purchase the equipment, software, materials, means of transportation, office supplies and other items it needs in accordance with the purchasing policy formulated by the chairman and approved by the board of directors, and fully consider the quality, quantity, price and transportation conditions of the products.

12.   **Non-Competition, Non-Solicitation and Non-Disparagement**

Party A hereby promises and agrees to Party B that unless Party B agrees in writing, after the establishment of the joint venture company, it will not engage in any of the following acts:

(a) Except for the operation of the joint venture company, directly or indirectly, alone or together with others, or assisting others to operate, manage, control or participate in the target business involving any research and development, production, distribution, promotion or marketing of the target products, or any business directly or indirectly competing with the target business, or has an equity interest in or a right to share in the proceeds of any such business as described above;

(b) Directly or indirectly, alone or with others, or assisting others, encourage or incite:

(i) Any customer, dealer or supplier related to the business of Party B or the company to refuse to continue transactions with Party B or the company, or refuse to conduct transactions in accordance with the standard terms of business transactions with Party B or the company;

(ii) Any director, officer or employee of Party B or the company no longer to work for Party B or the company;

(c) Directly or indirectly, alone or with others, or assisting others, in a way that competes with Party B or the company:

(i) Do or seek to do business with customers, distributors or companies who have business with Party B or the company;

(ii) Employ any directors, managers or employees of Party B or the company, or send an employment offer to them, or solicit such persons;

(d) Publicly disparage or harm Party B or the company.

## 13.   **Technology and Intellectual Property**

### 13.1   Intellectual Property Rights of the Joint Venture Company

(a) Any intellectual property rights (other than those owned or licensed by one party or a third party) arising in the ordinary course of business activities of the joint venture company or developed by the joint venture company shall be owned by the joint venture company. The parties agree to cooperate with each other to promote the executives and other staff of the joint venture company to establish a corresponding system to determine, apply for and/or register all relevant intellectual property rights developed by employees of the joint venture company in the name of the joint venture company.

(b) The parties shall try their best to urge the employees of the joint venture company to sign a standard labor contract, which shall include customary, reasonable and unified non-competition and invention transfer clauses, so as to ensure that the inventions and all interest in and in connection with the invention shall be vested in and the property of the joint venture company.

### 13.2   Trade Secrets

Without prejudice to the foregoing, if any party provides to the joint venture company or to the other party any document or other medium containing trade secrets or confidential information, it shall be prominently marked on the document or other medium with the words "strictly confidential, the materials contained herein shall not be disclosed, reproduced or transmitted to any third party without permission" or other similar marks. The chairman of the board shall be responsible for establishing the internal regulations applicable to the employees of the joint venture company regarding the management and protection of trade secrets. All

labor contracts signed by the joint venture company and its employees must include clauses on obligations of confidentiality and trade secrets.

14. **Labor Management**

14.1  The recruitment, employment, dismissal, resignation, wages and benefits of employees of the joint venture company, and other matters related to the employees of the joint venture company shall be independently decided by the joint venture company in accordance with the applicable laws and policies formulated by the company from time to time, without external interference. All employees under the name of BMP, the affiliate of Party A, shall be transferred to the joint venture company under the premise of meeting the requirements of the joint venture company.

14.2  The chairman of the board shall determine the qualifications and number of employees to be hired according to the business needs of the joint venture company. The joint venture company shall sign collective labor contracts or individual labor contracts with the employees to hire them.

14.3  The joint venture company shall ensure safe labor and civilized operation in accordance with applicable laws on labor protection. The joint venture company shall handle mandatory labor and social insurance for employees in accordance with applicable laws.

14.4  The joint venture company may adopt option incentive measures, with the cumulative total number of options not exceeding 10% of the company's total share capital (determined according to the total share capital before the option is added), the new option is granted to key employees, and the option has no voting rights, do not participate in dividends, only cash out when the company goes public or is acquired. The selection criteria and list of key employees are discussed and determined at the annual shareholder meeting.

1 5.   **Finance and Accounting**

15.1  Both parties shall use their best efforts to ensure that the company:

(a) maintains proper accounting records;
(b) to the greatest extent possible, all cash transactions in the course of its operations are avoided; in the event of any cash transaction in exceptional circumstances, it must be properly reflected in the company's books and supported by legitimate receipts and invoices.
(c) Provide to any party such reports and information as it may reasonably request upon reasonable written notice to the company;

(d) Allow every director of the company to inspect these accounting records at any reasonable time;

(e) The financial and accounting systems of the joint venture company shall be established in accordance with laws and regulations, and a financial accounting report shall be prepared at the end of each accounting year, which shall be audited by a certified public accountant in accordance with the law, and shall be issued after the end of each accounting year related to the financial accounting report of the year. Copies of each annual account shall be sent to both parties within three months.

15.2   Both parties shall ensure that each fiscal year of the company begins on January 1 and ends on December 31. The first fiscal year of a joint venture company shall start from the date of establishment of the company and end on December 31 of that year.

15.3   Any party, as long as it holds at least 10% of the company's equity, shall have the right to request an audit of the company's books and accounts at any time.
The party requesting an audit may elect to have such audit conducted by its own internal auditors or by an independent certified public accountant hired at its own expense. The company and both parties shall give full cooperation to such accountants, who shall have the right to inspect all books and records of the company.

15.4   Profit Distribution

After the joint venture company pays income tax, the board of directors shall determine the distribution plan for the surplus reserve fund, business development fund and statutory public welfare fund (funds used for employee incentives and benefits) from the after-tax profits in accordance with the law.

(a) After-tax profits (after deducting the funds mentioned in the preceding paragraph) shall be distributed according to the equity ratio of both parties, unless the shareholders' meeting decides to reinvest the after-tax profits in the joint venture company.

(b) If the joint venture company made a loss in the previous year, the profit of the current year shall be used first to make up for the loss. Profits shall not be distributed until all losses have been recovered. The undistributed profits of the previous year retained by the joint venture company can be distributed together with the distributable profits of the current year, or after making up for the losses of the current year.

Profits shall be distributed in proportion to the equity of both parties. Any distributable dividends shall be paid within 90 days of the end of the previous fiscal year.

**16.   Other Rights of Party B**

23

16.1   Party B shall have the right to send personnel including but not limited to financial, technical and warehouse personnel to the joint venture company;

1 6.2  Party B shall have the right to learn about the operation of the joint venture company, including but not limited to its finance, customers, market, inventory, etc., through regular reports or real-time information channels.

## 17.   Representations and Warranties

17.1   Mutual Representations and Warranties

Either party represents and warrants to the other party that on the date of signing this contract:

(a) The party has full power, authorization and approval to sign and perform this contract;

(b) This contract constitutes binding obligations of the party in accordance with its terms;

(c) The signing and delivery of this contract and the performance and compliance with its terms and regulations will not cause or constitute a breach of any agreement or document (to which the party is a contracting party or which is binding on the party), nor will it breach or violate any law, regulation, or order or injunction of any court or government agency; and

(d) It has disclosed to the other party all documents issued by any government agency that may affect its full performance of its obligations under this contract and the realization of the purpose of this contract by both parties, and the documents it provides to the other party do not contain false statements or misrepresentations or misstatement or omission.

17.2   Party A's statement, guarantee and commitment on the tangible assets that it intends to sell to the joint venture company in the future

(a) Party A or its affiliates have legal and complete ownership of such tangible assets and have the right to transfer such assets to the company; such assets or any rights and interests related to them are not subject to any mortgage, pledge or restrictions on the third party's claim to such assets; after the assets are delivered, the company will enjoy all the rights that the owner of the assets should enjoy according to law, including but not limited to the rights to possess, use, transfer and dispose of such assets according to law; Such assets will not be confiscated or seized, or imposed on mortgages, liens, pledges or other forms of burden due to any applicable laws or third party claims.

(b) As of the date of asset delivery, Party A's exercise of rights to such assets will not infringe on the patent rights, copyrights, trademark rights or other intellectual

property rights of third parties, and no third party has made claims on the above rights; In the future, the company's exercise of rights to such assets will not infringe the patent rights, copyrights, trademark rights or other intellectual property rights of others and third parties.

(c) Party A has not made any agreement, arrangement or promise on such assets that can or may result in mortgage rights, pledge rights or other rights and/or interests in favor of a third party on the assets after the asset delivery date (including the asset delivery date);

(d) As of the asset delivery date, Party A has not been informed of any third party exercising or claiming to exercise any rights that have a material adverse effect on the delivered assets or any part thereof; nor has there been any dispute or lawsuit or arbitration directly or indirectly related to the delivered assets; there will be no unpaid nor unfulfilled tax liabilities and liabilities associated with the delivery of the Assets.

(e) Before the asset delivery date (including the asset delivery date), such assets are in good operating condition, and Party A or other affiliates have regularly carried out appropriate maintenance and repair.

17.3    Consequences of False Representations and Warranties

If any of the above representations and warranties made by a party is substantially inconsistent with the actual situation, it constitutes a material breach of the contract by the party.

18.    **Termination, Dissolution and Liquidation**

18.1    Termination Events

This contract shall be terminated on the date of expiry of the term of the joint venture. Before the expiration of this contract, unless otherwise specified in this contract, if any of the following circumstances occurs, this contract shall be terminated:

(a) Liquidation, dissolution or indefinite suspension of business of the company;

(b) The company executes a general transfer for the benefit of creditors, or appoints a custodian or trustee to take possession of the company's property and assets;

(c) According to the Registration Statement on Form S-1 under the Securities Act of 1933, as amended, the company formally commits to a public offering of shares of common stock;

(d) Sell, transfer or dispose of all or a substantial part of the company's property or business, or merge the company with another company (not a wholly-owned subsidiary), except for a merger for the purpose of changing the company's domicile;

(e) Unanimous written consent of shareholders holding more than 70% of the shares; or

25

(f) As far as any shareholder is concerned, according to the terms and provisions of this contract, when the shareholder disposes of all the shares it owns.

(g) Party B ("Notifying Party") may send a written notice to the other party at any time to express its intention to terminate this contract and terminate this contract in accordance with Section 17.2 when the following circumstances occur:

   (i)     Party B fails to transfer shares to Party A according to 5.5.4;

   (ii)    The other party has materially breached the contract or the articles of association and has not remedied such breach within the remedial period (as defined below); or

   (iii)   The other party is insolvent, or is in liquidation or dissolution proceedings, or goes out of business, or becomes insolvent to pay its debts as they fall due; or

   (iv)    A Force Majeure (as defined below) event or its effects lasting more than six (6) months, having a material adverse impact on the joint venture company's business, assets and operations, and the parties are unable to reach an equitable resolution.

For the avoidance of any objection, the act of either party giving a notice of its intention to terminate this contract shall not in itself constitute a termination of this contract. If one of the above situations occurs, in addition to enjoying its rights under this contract or relevant laws, the party entitled to issue a notice of intention to terminate the contract also has the right to suspend performance of its obligations under this contract until the relevant situation is resolved.

18.2   Termination Procedure

(a) If the notifying party gives written notice of its intention to terminate the contract pursuant to Section 17.1(g), the parties shall negotiate within thirty (30) days of such notice to try to resolve the circumstances that gave rise to such notice. If both parties fail to reach a mutually satisfactory agreement within this thirty (30) days (or an extended period agreed in writing by both parties), the notifying party shall have the right to send a written notice to the other party to terminate this contract.

(b) If this contract is terminated, the board of directors shall convene an emergency meeting of the board of directors as soon as practically possible, and both parties shall urge the directors designated by them to attend the meeting in person, through proxies or through communication equipment and vote for a unanimous resolution to approve the termination of this contract at this meeting; or instead of convening a board meeting. by signing a written resolution circulated among the directors (whichever is applicable).

(c) After the board of directors approves the termination of this contract and the dissolution of the joint venture company, the board of directors shall submit a dissolution application to the original registration authority. If the other party does not cooperate in the termination and dissolution procedures, the notifying

party shall have the right to unilaterally submit an application for termination and dissolution to the registration authority if permitted by relevant laws.

(d) After the registration agency registers the application for dissolution, the joint venture company shall be dissolved and liquidated in accordance with the relevant procedures stipulated by relevant laws and the provisions of Section 17.3 below.

18.3   Liquidation

(a) Within fifteen (15) days after the application for dissolution is approved and registered in accordance with Section 17.2, the board of directors shall designate relevant persons to form a liquidation committee, which shall have the right to represent the joint venture company in all legal matters. The liquidation committee shall perform its duties in accordance with applicable laws and the principles stipulated in this contract.

(b) The members of the liquidation committee shall undertake entrusted responsibilities to the joint venture company and shall fully abide by the provisions of relevant laws during the performance of their duties. Unless otherwise stipulated by relevant laws, the liquidation committee shall make a decision by majority vote after consultation.

18.4   Continuing Obligations of the Parties

The following sections shall survive the termination of this contract and the termination, dissolution, liquidation and cancellation of the joint venture company: Article 9 (Board of Directors) (but only with respect to the actions the board of directors are required to take after the termination of this contract and before the cancellation of the joint venture company) , Section 12 ( Non-competition, Non-solicitation and Non-disparagement), Section 17 ( Termination, Dissolution and Liquidation), Section 18 ( Breach of Contract) (but its effect is limited to the statutory breach of contract before the termination of this contract and breach of other continuing obligations), Section 19 ( Obligations of Confidentiality), Section 21 ( Resolution of Disputes), and Section 1 (Definitions and Interpretation) (to the extent required to interpret the foregoing).

19.   **Breach of Contract**

19.1   Remedies for Breach of Contract

Except as otherwise provided in other provisions of this Contract, if one party ("Breaching Party") fails to perform any of its principal obligations under this Contract or fundamentally breaches this Contract, the other party ("Aggrieved Party") may:

(a) give the breaching party a written notice stating the nature and extent of the breach and requiring the breaching party to remedy at its own expense within a reasonable period of time specified in the notice ("remedial period"); and

(b) If the breaching party fails to remedy within the remedial period (or, if there is no remedial period, at any time after such breach), the aggrieved party may, in addition to its rights under applicable law, make a claim for direct and foreseeable damages arising from the breach of contract.

**20.  Obligations of Confidentiality**

20.1   Confidentiality Obligations

Either party to this contract shall be obliged to keep confidential the confidential information it obtains or discloses to by the other party and the joint venture company. During the term of this contract and for two (2) years after the termination of this contract, the receiving party must:

(a) Keep confidential the confidential information;

(b) Not to use the confidential information for any purpose other than those specified in this contract; and

(c) Confidential information shall not be disclosed to any person (person or entity) other than employees, agents, attorneys, accountants or other advisors of the party or other affiliates of that party or other affiliates who have a need to know the confidential information in order to perform their duties, and the above persons (collectively, the "Permitted Disclosing Parties").must have signed a written nondisclosure agreement.

20.2   Exclusions

Section 19.1 above shall not apply to the following information:

(a) The receiving party has a written record to prove that it has mastered the information before the disclosing party disclosed it;

(b) The information enters the public domain currently or in the future not as a result of the receiving party's breach of this contract; or

(c) The receiving party obtains it from a third party who has no obligation of confidentiality to the information.

20.3   Return of Materials

On the expiry date of the contract, or upon the request of the disclosing party at any time, the receiving party shall (i) return to the other party or destroy at the request of the other party all materials (including copies thereof) containing confidential

information of the other party or the joint venture company, and (ii) within ten (10) days after the other party makes such a request, give the other party a written guarantee that it has returned or destroyed the above materials.

## 21.  Force Majeure

21.1   Definition of Force Majeure

"Force majeure" refers to all events that are beyond the control of both parties to this contract, unforeseeable, unavoidable or insurmountable, which make any party to this contract unable to perform part or all of this contract. Such events include but are not limited to earthquakes, typhoons, epidemics, floods, fires, wars, strikes, riots, government actions, changes in the application of legal provisions to fire, or any other unforeseeable, avoidable or uncontrollable events, including international events generally accepted as force majeure in business practice.

21.2 Consequences of Force Majeure

(a) In the event of a force majeure event, if a party's obligations under this contract are delayed due to force majeure, the performance of the obligation shall be automatically suspended during the delay period, and the performance period shall be automatically extended. The extended period is the period of suspension, and the party shall not be liable for breach of contract.

(b) The party that claims to be affected by force majeure shall notify the other party in writing in a timely manner, and provide sufficient evidence of the occurrence and duration of force majeure to the other party within fifteen (15) days thereafter. The party affected by force majeure shall also make all reasonable efforts to eliminate the adverse effects of force majeure.

(c) In the event of force majeure, the two parties shall immediately conduct consultations to seek a just solution, and make every reasonable effort to minimize the impact of the force majeure.

## 22.  Settement of Disputes

22.1   Governing Law

The conclusion, interpretation and execution of this agreement, as well as the settlement of disputes related to this agreement between the parties shall be governed by Chinese laws and regulations.

The establishment and operation of the joint venture shall comply with the relevant laws of Florida, USA.

For matters related to the joint venture company in this agreement, if the laws of Florida must be applied according to the mandatory provisions of the relevant laws of Florida, the laws of Florida shall only be applied to the minimum necessary extent.

22.2   Arbitration

Any dispute arising from the performance of this contract or related to this contract shall be submitted to Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center, "SIETAC") for arbitration as a final settlement, and the place of arbitration shall be in Shanghai. The arbitration shall be conducted in accordance with the latest version of the arbitration rules of SIETAC in force at the time of application for arbitration, and the language of the arbitration shall be Chinese. There shall be three arbitrators. Each party shall appoint an arbitrator within fourteen days after receiving the arbitration notice from the arbitration commission, and the two arbitrators designated by both parties shall appoint the third arbitrator as the presiding arbitrator of the arbitration tribunal. If, within twenty-eight days of receipt of the notice of arbitration, one party fails to appoint its arbitrator, or the two arbitrators appointed by the parties fail to agree on the appointment of the third arbitrator, that arbitrator shall be appointed by SIETAC in accordance with its arbitration rules. The arbitrator shall not be a current or former employee, agent, consultant, or attorney of either party. Arbitrators may be selected from persons other than the list of arbitrators of the Arbitration Commission. The arbitration award shall be based on a majority opinion of the arbitrators and made in writing.

2 2.3   Continuity of Rights and Obligations

When a dispute arises and is being resolved through friendly negotiation or arbitration, both parties shall continue to exercise their respective other rights under this contract, and at the same time continue to perform their respective other obligations under this contract. However, the rights and obligations related to the disputed matters shall be excluded.

22.   **Miscellaneous**

23.1   Independence between the contracting parties

Nothing in this contract shall be construed or implied as to:

(a) make either party the agent of the other party (unless the other party agrees in advance in writing); or
(b) authorizes either party to assume any costs or other obligations of any kind to the other party (unless the other party agrees in writing).

30

23.2   Scope of the Contract

This contract shall be legally binding upon and shall inure to the benefit of the parties hereto and their respective legal successors and assigns.

23.3   Revisions

This contract can only be modified after both parties sign a written document; if the relevant laws provide otherwise, this contract can only be modified after signing a written document and obtaining the approval of the relevant registration authority.

23.4   Notice

(a) This contract stipulates that the notices or written documents sent by one party to the other party (including but not limited to all offers, written documents or notices under this contract) shall be made in English and Chinese, and served to the corresponding party by the following methods:

    (i)       in person; or
    (ii)      by courier letter; or
    (iii)     fax.

(b) Notices shall be deemed to have been given at the time below:

    (i)       if delivered in person, upon delivery at the named address and signed return receipt or other proof of service;
    (ii)      if served by courier letter, on the fifth working day after the date of delivery; and
    (iii)     If served by fax, the business day following the date stamped on the report confirmation (indicating that a complete, uninterrupted fax has been sent to the relevant fax number) from the sender's fax macine.

(c) During the term of joint venture, one party may notify the other party to change the address of service at any time according to the method stipulated in Section 22.4.

     Party A: M ENG XIANBIN
     Mailing address: 8 105 Anderson Road, Tampa, FL 33634
     Phone: +1 (813) 443-0757
     Recipient: M ENG XIANBIN
     Email: Ben@BMP-USA.com

31

Party B: Zhejiang Juhua Co., Ltd.
Mailing address: Kecheng District, Quzhou City, Zhejiang Province
Tel: +86 (570) 3097988
Recipient: Lei Jun
E-mail: f hlj@juhua.ocm.cn

23.5   Severability
The invalidity of any provision of this contract shall not affect the validity of other provisions of this contract.

23.6   Entire Agreement
This contract and its attachments (if any) constitute the entire agreement reached between the parties on the subject matter of this contract, and replace all previous consultations, negotiations and agreements reached between the parties on the subject matter.

23.7   Waiver of Rights
If a party fails or delays in exercising some of its rights, powers or privileges under this contract, it does not constitute a waiver of such rights, powers or privileges. If the party has already exercised or partially exercised a certain right, rights or privilege, it is not prevented from exercising of other rights, powers or privileges in the future.

23.8   Fees
Unless otherwise stipulated in this contract, both parties shall bear their own lawyer or other professional consultant fees related to the preparation, negotiation and conclusion of this contract, as well as any taxes or fees payable by them for their performance of their respective obligations under the contract.

23.9   Attachments
The attachments (if any) of this contract shall be an integral part of this contract and have the same effect as the terms of this original contract. If there is a conflict between the terms of the original contract and the attachments, the terms of the original contract shall prevail.

23.10  This contract comes into effect on the date of signing by both parties. It is written in Chinese and has ten copies. Party A shall hold two copies and Party B shall hold eight copies.

[There is no text below, it is the signature page]

- 33 -
*[signature page]*

This is to certify that duly authorized representatives of both parties have duly signed this contract on the date set forth on the first page of this contract.


MENG Xianbin

Personal Signature: [signature affixed]


T.T International Company

Signature:            [signature affixed]

Name:                ZHANG Tianli


Zhejiang Juhua Co., Ltd.

Signature:            [signature affixed]

Name:                TONG Jihong

Position:             Board Director

## DECLARATION AND CERTIFICATION

I, _____Richard Wei Peng_____, declare that I am a

( ✓ )   Certified Court Interpreter as described in GC68565

I am certified to interpret and translate <u>from the Mandarin language to the English language and from the English language to the Mandarin language.</u>

My Certification Number is:  _____301140_____

I further declare that I have translated the attached document <u>from the Mandarin language to the English language.</u>

I declare to the best of my abilities and belief, that this is a true and accurate translation of the <u>Mandarin</u> language text of <u>Joint Venture Contract.</u>

## Specific Description of the Document

<u>Joint Venture Contract between Xiabin Meng and Zhejiang Juhua Co., Ltd. dated February 28, 2018.</u>

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration is signed this <u>19th day of March, 2023</u> in <u>Diamond Bar</u>, California.

Richard Wei Peng
_____
Name of Certified Court Interpreter

_____
Signature of Certified Court Interpreter

# 合资合同

由

**MENG XIANBIN 先生**

（甲方）

和

浙江巨化股份有限公司

（乙方）

签署

2018 年 2 月 28 日



# 目录

1.   定义和解释 .................................................................................................... 2

2.   合资双方 ........................................................................................................ 6

3.   合资公司的设立 ............................................................................................ 6

4.   目的、目标、经营范围及合资期限 ............................................................ 7

5.   投资总额和股本金 ........................................................................................ 8

6.   证照 .............................................................................................................. 12

7.   双方的责任和义务 ...................................................................................... 12

8.   股东会 .......................................................................................................... 14

9.   董事会 .......................................................................................................... 16

10.  运营和管理 .................................................................................................. 18

11.  市场、销售和采购 ...................................................................................... 19

12.  不竞争，不招揽和不贬低 .......................................................................... 20

13.  技术和知识产权 .......................................................................................... 20

14.  劳动管理 ...................................................................................................... 21

15.  财务与会计 .................................................................................................. 22

16.  乙方的其它权利 .......................................................................................... 23

17.  陈述与保证 .................................................................................................. 23

18.  终止、解散及清算 ...................................................................................... 24

19.  违约 .............................................................................................................. 27

20.  保密义务 ...................................................................................................... 27

21.  不可抗力 ...................................................................................................... 28

22.  争议的解决 .................................................................................................. 29

23.  其它规定 ...................................................................................................... 30

# 合资合同

本合资合同（以下简称为"**合同**"）由以下双方于 2018 年 2 月 28 日在浙江衢州签订：

(1)　MENG XIANBIN 先生，美国居民，护照号为 P503981640，其住址为 5814 Mariner Street, Tampa, FL 33609, USA（以下简称为"**甲方**"）；与

(2)　浙江巨化股份有限公司，是一家根据中国法律设立的股份有限公司，其注册地址为浙江省衢州市柯城区（以下简称为"**乙方**"）

甲方和乙方以下单独称为"**一方**"，并合称为"**双方**"。

### 前言

双方希望在美国佛罗里达州设立一家合资经营企业（"合资公司或公司"）以生产、经营致冷剂等相关产品。

双方有意根据本合同的条款就公司的设立、业务开展和日常运营管理等方面进行约定并据此进行合作。

经友好协商，按照平等和互惠互利原则，并依照适用法律，各方同意如下条款：

### 1.　定义和解释

### 1.1.　定义

除非本合同条款或上下文另有所指，下列用语的含义如下：

关联方　　　　　　　是指被一方直接或间接地控制、与该方受共同控制、或者控制该方的任何个人或法律实体；"控制"的含义是指对公司管理享有指令权、或者产生指令的权力，无论是以合同、具有投票权的股权或其它方式。为避免歧义，任何自然人的配偶、直系亲属及其配偶的直系亲属均

为该自然人的关联方。为本合同目的，关联方除包括 BMP 以外，也包括 T.T International 公司。

**适用法律**　　　是指对本合同一方或本合同标的适用的法律、法规、规章，以及立法、行政或司法机关颁布的通知、命令、决定或其他公示文件。

**良好职业准则**　是指由董事会制定的、在从事董事和高管的职业活动中必须遵循的，符合董事和高管职业特征的价值观念、行为准则和规范。

**登记机关**　　　是指有权受理合资公司设立、变更之申请并核发登记文件（如需要）的主管机关。

**公司章程**　　　是指由双方于本合同签署日同日签订的合资公司的公司章程。

**主管机关**　　　是指任何政府部门，包括政府的行政、司法、立法部门或政府所属的部门、委员会、机构、派出机构或其它授权实体。

**工作日**　　　　是指：

(a) 就在美国实施的任何行为而言，指美国境内公司通常对外营业的任何一日，包括美国政府宣布为临时工作日的星期六或星期日（"调休工作日"），但不包括法定节假日以及调休工作日以外的星期六或星期日；

(b) 就在美国境外的任何其它国家或者任何其它地区实施的行为而言，则指在对可适用的司法辖区内，公司开展正常营运活动的任意一天。

| | |
|---|---|
| **商业计划** | 是指经公司董事会不时批准的合资公司的总体业务计划。 |
| **合资公司或公司** | 是指拟命名为 "iGasUSA Inc."，由双方依照本合同以及公司章程设立的一家合资企业。 |
| **保密信息** | 是指由任何一方（及其关联方）或合资公司的任何业务、市场、技术、运营或其它相关信息。在披露时，该等资料是被指明（或者类似于被指明）为保密的，在保密环境下披露的，或者将被双方基于合理的商业判断认定为保密的，特别包括下文定义的商业秘密。 |
| **注册会计师** | 一家知名且声誉良好的在美国开展业务的独立注册会计师事务所。 |
| **董事** | 由合资公司股东不时任命的公司董事会成员。 |
| **股权或股份** | 指根据公司设立当地适用法律、本合同及公司章程的规定，附于公司股本金上的所有法律及经济权利和利益。 |
| **出资证明** | 指根据第 5.4 条的规定，由合资公司向其股东签发的、证明该股东缴付出资的证书。 |
| **证照** | 指由任何有权机关在限定的时间内发放（无论是明示的行为还是虽没有行为但是应被认定给与）的与合资公司的设立、运营或者资产有关的任何赞同、注册、归档、同意、公证、证书、许可、审批、允许、授权或者豁免。 |
| **中国** | 是指中华人民共和国，为本合同目的，排除香港、澳门及台湾地区。 |

| | |
|---|---|
| **商业秘密** | 指不为公众所知悉、能为权利人带来经济利益、具有实用性并经权利人采取保密措施的任何技术信息和经营信息。 |
| **高级管理人员** | 指合资公司的首席执行官、销售总监、财务总监、人力资源总监和生产总监。 |
| **知识产权** | 指在全球任何司法管辖区的任何知识产权，包括(i)专利、专利申请、发现和发明；(ii)商标、服务标记、商业装饰、商号、企业名称或网络域名，连同与之相关的所有商誉；(iii)版权；(iv)上述任何项目的注册和申请注册；(v)计算机软件；以及(vi)保密信息，包括专有知识和商业秘密。 |
| **目标产品** | 指致冷剂及相关产品（包括发泡剂、推进剂、医用气雾剂、清洗剂、灭火剂等同类产品）。 |
| 目标业务 | 指研发、生产、采购、储存、运输和销售（代理或经销）目标产品。 |
| **BMP** | 指 BMP International, Inc.和/或 BMP USA, Inc. |

1.2.  解释

本合同中提及任何适用法律、法规或任何其它法律性文件，或其项下的任何规定，包括其不时修订的版本。

1.2.1  本合同中提及的"人"根据上下文包括任何个人或实体（包括任何公司、商号或其他企业或实体、合资企业、机构、国家或政府部门）。

本合同各款标题仅为方便查阅而设，对本合同的理解或解释并无影响。

本合同中提及的任何一方或任何合同、协议或文件的一方包括该方的继受者及其允许的受让人。

1.2.2 本合同中"包括"具有"包括但不限于"的含义。

2. **合资双方**

    (a)  甲方：MENG XIANBIN

          国籍：美国

    (b)  乙方：浙江巨化股份有限公司

          乙方法定代表人或授权代表：雷俊

          职位：总经理

国籍：中国

3. **合资公司的设立**

3.1 双方特此同意，根据适用的法律法规和本合同的约定，起草合资公司的公司章程。本合同与公司章程规定不一致或发生冲突时，以本合同规定为准，双方应修改公司章程以使其与本合同规定一致；但合资公司设立地法律有强制性规定的除外。

3.2 **公司名称**

公司名称为：iGas USAInc.

3.3 **公司注册地址**

公司注册地址为：8105 Anderson Road, Tampa, FL 33634

3.4 **C 型股份有限公司**

合资公司的组织形式应为根据佛罗里达州法律成立的一家 C 型股份有限公司（C Corporation）。任何一方仅以其认缴的出资额所形成的股份为限对合资公司承担责任。合资公司应以其全部资产对公司的债务承担责任。

3.5　适用法律

合资公司是一家根据美国佛罗里达州法律合法成立的法人。合资公司受美国佛罗里达州相关法律的管辖和保护。合资公司所从事的一切行为和活动均须遵守美国佛罗里达州的相关法律。

3.6　公司设立与运营所需证照

下列有关公司设立与合资公司运营的许可或批复，应在指定期限内取得：

（i）　就合资公司设立而需在中国、美国及其他相关法域取得的批准或备案，应在公司设立前取得；

（ii）　根据美国适用法律，合资公司运营所需的证照，应在公司设立后 30 天内取得。

**4.　目的、目标、经营范围及合资期限**

4.1　合资目的

双方设立合资公司的目的是基于甲方在美国致冷剂及相关行业丰富的销售经验和能力、对行业趋势的深刻洞察能力和把握能力、已建立的覆盖范围广泛的客户群体和销售渠道、初步完善的混配设施和物流体系，同时基于乙方在致冷剂及相关行业强大的技术背景和团队、卓越的产业链优势和生产运营能力、充足的产能保障能力和良好的成本控制能力等优势，双方强强联合，拟在美国致冷剂市场进一步提升竞争能力、创造良好的经济效益。

4.2　合资公司目标

合资公司的目标是通过最大化发挥双方在产业和销售方面的优势，经过几年的迅速发展扩张，实现公司在美国资本市场上市、被乙方或其关联方并购或被第三方溢价收购，实现股东利益最大化。

4.3   经营范围

合资公司的经营范围包含：生产、采购、混配、储存、运输和销售致冷剂及相关产品（包括发泡剂、推进剂、医用气雾剂、清洗剂、灭火剂等同类产品）。

4.4   商业计划

合资公司的商业计划由董事会在考虑市场实际情况、员工的能力以及董事会认为重要的其他因素后确定。该商业计划可由董事会不时根据市场行情以及其他相关的情况予以扩大或缩小。

4.5   独立实体

合资公司作为一个独立的经济实体，自主经营并开展业务。

4.6   合资期限

除非双方另行协商确定，合资公司的合资期限（"合资期限"）为二十年，从合资公司设立之日起算。

5.   **投资总额和股本金**

5.1   投资总额

公司的投资总额为：USD$29,411,765（大写：贰仟玖佰肆拾壹万壹仟柒佰陆拾伍美元）。

5.2   股本金

公司的股本金（"股本金"）为：USD$29,411,765（大写：贰仟玖佰肆拾壹万壹仟柒佰陆拾伍美元），发行股份数为29,411,765股，均为普通股，每股价值为USD$1.00。

5.3　　出资

(a)　　甲方认缴的出资额为 USD$19,411,765（大写：壹仟玖佰肆拾壹万壹仟柒佰陆拾伍美元），持有合资公司发行的 19,411,765（大写：壹仟玖佰肆拾壹万壹仟柒佰陆拾伍）股，约占合资公司股本金的百分之六十六（66%），均以现金在公司成立日实缴出资。

(b)　　乙方认缴的出资额为 USD$10,000,000 (大写：壹仟万美元)，持有合资公司发行的 10,000,000 (大写：壹仟万)股，约占合资公司股本金的百分之三十四（34%），均以现金在公司成立日实缴出资。

5.4　　出资证明

董事会批准后公司出具股权证明书，证明双方出资对应的股份数。具体股权证明书内容将在公司章程中明确规定。

5.5　　股权转让

5.5.1　除非本合同另有明确规定，在 2022 年 12 月 31 日之前，未经另一方事先书面同意，任何一方不得向第三方出售、转让、赠与或获益任何其他方式处置其持有的合资公司股份（"锁定期"）。锁定期后，除根据第 5.5 条规定的转让外，双方同意不以任何其他方式直接或间接出售、转让、或处置其股份。任何违反本条款和本合同其他要求的处置均无效。

为免歧义，第 5.5.4 条规定不受锁定期的限制。

5.5.2　优先购买权

(a)　　限制。根据本第 5.5.2 条，任一方不得出售、转让或以其他方式处置（不论自愿或因合同或法律的实施）其股份，除非其已从拟购买股份（称为"待售股份"）的第三方（"购买方"）收到善意书面要约（"要约"），已确定购买价格并根据确定条款按美元计值，该要约应由购买方有效签署，并且在不早于要约期（定义见下文）届满后 90 日内不可撤销。在接受该要约前，出售股份的一方必须首先以该要约相同的价格和条款条件，以书面形式向公司（以及本合同确定的其他股东）要约。

(b) 披露。转让股份一方应向公司及其他股东披露上述要约的条款条件以及要约人的身份，包括拟收购的股份数、每股价格及总对价，并应以书面形式以相同条款条件向公司和其他股东要约通知转让待售股份（"要约通知"），该要约应为不可撤销，期限为该要约通知送达公司后九十（90）日（"要约期"）。收到该要约通知后，公司应在六十（60）日内（"首次要约期"）决定是否接受全部或部分待售股份的要约并提出相应履行。

(c) 股东权利。如果公司在首次要约期到期前不接受购买全部或部分股权的要约，则其他股东有权决定是否接受要约，并按照确定的价格和条款条件购买公司未接受购买的所有股权。其他股东应于首次要约期届满后三十（30）日内向公司（"第二要约期"）提出是否接受要约及相应履行。如公司及/或其他股东于要约期届满前未选择购买全部待售股份，则此要约将被视为否决。

(d) 按比例权利。如超过一名股东接受该要约，则各股东有权按其股份比例确定购买比例。

(e) 待售股份购买的交割。如果公司和/或其他股东接受要约而购买所有的待售股份，则应在要约购买后九十（90）日内完成待售股份的交割，或者如果更晚，按照要约中规定的交割日期。转让股份的一方、公司和所有受让股东应根据要约的条款和本 5.5.2 条的规定签署必要且适当的文件和文书，以完成购买待售股份。买卖股份的对价应按照第 5.5.4(b)条支付。

(f) 转让。如果要约结束时，公司及/或其他股东不接受要约购买所有待售股份，且在触发随售权（定义见下文）的情形下其他股东不行使第 5.5.5 条规定的随售权时，则转让股份的一方才可以，在要约期届满后的九十（90）日内，自由出售、转让或以其他方式向特定购买方根据要约价格和条款条件处置待售股份，受限于本合同第 17 条的规定。在该九十（90）日期限届满后，待售股份将再次受制于本第 5.5.2 条的规定。

5.5.3 限制的放弃。无论是否有任何相反约定，一方可以在事先征得公司及所有股东书面同意下的情况下转让其股份。

5.5.4 强制转让

(a) 转让事件。为本合同之目的，任一下述事件可构成"转让事件"：

(i)　甲方作为公司高级管理人员被终止或以其他方式或因任何原因停止向公司提供服务或表达停止服务的意思；

(ii)　公司持续亏损三年以上；

(iii)　股东破产或股东拟为债权人利益作出转让，或由股东提交破产申请或对股东提出破产申请，或为股东指定接管人；或

(iv)　连续六个月未能就同一事项在公司股东会或董事会决议通过并将对合资公司的业务、资产或运营产生重大负面影响，且经股东双方高层协商未能解决的。

乙方可以在上述转让事件发生后通过向甲方（或其配偶或授权代表（视情况而定））发出书面通知（"要约通知"）的方式通知甲方，要求其购买乙方的全部股份（"转让要约"）。在收到要约通知的四十五（45）日内（"要约期"），甲方（或其配偶或授权代表（视情况而定））应通知乙方其是否接受转让要约的决定。如果甲方（或其配偶或授权代表（视情况而定））接受转让要约，则双方应尽最大努力尽快完成股权转让，且甲方（或其配偶或授权代表（视情况而定））购买乙方股权所应支付的价款应为公司指定的注册会计师依照国际通用会计准则评估确定的市场公允价格。

如果甲方（或其配偶或授权代表（视情况而定））拒绝转让要约或者甲方未能在收到出售要约通知的三十（30）日内予以回复，则双方将适用本合同第17.1条的规定。

(b)　支付方式。除本合同另有规定外，根据上述第5.5.4(a)条确定的转让价格，应在要约期届满后三十个工作日（30）内，以全额现金支付。

5.5.5　随售权。如甲方意欲对外转让其持有的大多数股份（"转让"），则甲方应在该转让预计交割日前不少于三十（30）日向乙方发出书面通知（"转让通知"）。转让通知应包括：（i）甲方拟转让的股份数；（ii）转让的主要条件（包括该等股份拟转让的价格）及拟受让人身份信息；及（iii）拟转让股份数占甲方持有股份总数的百分比。乙方收到该转让通知后，应有权按甲方拟转让股份的同等比例（或少于该比例）向拟受让人转让其股份（"随售权"）。

(a)　乙方自转让通知送达起十（10）日内应向甲方送达其选择转让全部或部分股份的书面通知（"选择通知"），转让股份数不超过（x）甲方拟转让股份数/甲方持有股份总数的分数乘以（y）转让前乙方

持有的合资公司股份总数。该选择不可撤销，且双方应为尽快完成转让采取行动并签署必要文件。

(b)　如拟受让要约股份的受让人拒绝根据本合同进行随售股份的受让，则甲方亦不能向该受让人出售其拟转让的股份。

(c)　为免歧义，乙方不能就股份：（i）在向公司转让时行使随售权；或（ii）在根据本合同第 5.5.4 条进行股权转让时行使随售权。

## 6.　证照

### 6.1　运营所需证照

甲方应负责及时地办理与第 3.6 条项下（除(i)项下应由乙方自行办理的除外）规定的各项合资公司运营所需证照有关的一切申请或审批程序，由此产生的所有政府规费应由合资公司承担。乙方应及时给予所有必要协助，该等协助不得无理拒绝和延迟。

### 6.2　证照效力的维持

双方应促使合资公司在整个合资期限内采取所有必要措施并实施所有必要行为以维持合资公司获得的、与其设立、公司形式、有效存续及业务开展有关的所有证照保持有效。

## 7.　双方的责任和义务

### 7.1　甲方的责任和义务

除履行其在本合同项下的其他义务外，甲方还应负责以下事宜：

(a)　协助合资公司取得所有证照，并毫不迟延地将其从主管机关获得的相关证照文件提供给乙方及合资公司；

(b)　协助合资公司联络美国有关主管机关；

(c)　自合资公司成立之日起，除允许在最长不超过 6 个月的期限内着手销售并处理其名下或关联方名下的与目标产品相关的存货（不包括空钢瓶和 BMP 为客户开发的特殊混配产品）外，应立即停止并确保其关联方停止从事目标业务，所有该类业务均应转移至合资公司



经营，甲方及其关联方今后不得通过新设、协议安排或其它方式在合资公司以外从事致冷剂及其同类产品的相关业务。合资公司成立后，甲方原则上应首先销售处理甲方关联方的存货。随着致冷剂等应用的更新换代，以上产品和业务的替代品也应在合资公司中经营，以保持合资公司的长期运行和发展；

(d) 将其原有目标产品的客户、渠道、品牌、团队等无形资产注入合资公司；

(e) 在合资公司成立后，将其或其关联方（为本条起见，不含 T.T. International）名下所有的与致冷剂经销相关的有形资产（包括土地厂房、车辆和设备等），以市场公允价格和条件租赁给合资公司使用；

(f) 在合资公司成立后的适当时机，将其或关联方（为本条起见，不含 T.T. International）名下的上述有形资产以及剩余的空钢瓶以市场公允价格和条件出售给合资公司，并协助办理各项过户手续，以确保合资公司合法拥有上述有形资产；并

(g) 根据其与合资公司另行签署的书面协议，处理合资公司不时委托的其他事项。

7.2 乙方的责任

除履行其在本合同项下的其他义务外，乙方还应负责以下事宜：

(a) 为合资公司提供优先产品保供、价格优惠等支持（优惠方式另行商定）；

(b) 积极开展以合资公司或股东双方另行组建的公司为主体在海外建设生产装置的工作，乙方将为海外建设运营 HFC-134a、HFC-32 和 HFC-125 生产装置提供生产技术及其授权许可，以及建设运营团队（团队的工资薪酬由被投资主体自行支付），并在海外装置被投资主体满足融资条件的前提下向该主体提供融资；乙方同时为合资公司在美国的分装及经销提供必要的技术支持；

(c) 协助合资公司在中国境内的设备、仪器、原材料和服务的采购（若需要）；

(d) 同意并促使合资公司以市场公允价格和条件承租并受让甲方或其关联方（为本条起见，不含 T.T. International）名下所有的与致冷剂经销相关的有形资产及剩余的空钢瓶；同意合资公司在半年内开展车辆及设备的收购；并

(e) 根据其与合资公司另行签署的书面协议，处理合资公司不时委托的其他事宜。

## 8. 股东会

### 8.1 普通决议

以下事项由合资公司的股东会以普通决议的方式通过：

(a) 审议批准董事会的报告；

(b) 审议批准合资公司的年度财务预算方案、决算方案；

(c) 为合资公司经营活动，设置担保金额不超过 100 万美元针对合资公司的资产设置的任何抵押、担保、留置或权利负担；

(d) 合资公司与任一股东、董事或其他关联方之间的单笔交易额不超过 30 万美元且年度交易额不超过 100 万美元的交易；

(e) 仅为公司经营需要且单笔金额不超过 50 万美元的固定资产购置；及年度累计不超过 50 万美元且单笔不超过 10 万美元的固定资产处置。

### 8.2 除非法律对表决权有更高比例的强制性要求，股东会的普通决议应经持有合资公司 51%及以上表决权的股东同意后方视为已经通过股东会批准。

### 8.3 高级决议

以下事项由合资公司的股东会以高级决议的方式通过：

(a) 合资公司章程的任何修改；

(b) 决定合资公司的经营方针、对外股权投资、商业计划及融资方案；

(c)　　在合资公司成立之后发生的，合资公司股本金的任何增加/减少，合资公司的分拆、重组、整体转让或变更公司形式；

(d)　　合资公司根据相关法律法规或本合同的约定需进行清算或解散而采取相关行动的决策；

(e)　　为合资公司经营活动，设置担保金额超过 100 万美元针对合资公司的资产设置的任何抵押、担保、留置或权利负担，或为第三方提供任何形式的对外担保；

(f)　　单笔金额超过 50 万美元的固定资产购置；

(g)　　出售或处置合资公司拥有或实际上拥有的单笔超过【10】万美元或年度累计超过 50 万美元的资产；

(h)　　审议批准合资公司的利润分配方案和弥补亏损方案；

(i)　　合资公司与任一股东、董事或其他关联方之间的单笔交易额超过 30 万美元或年度累计交易金额超过 100 万美元的交易，但经公开招标程序确定的关联交易事项除外；

(j)　　向第三方提供借款；

(k)　　合资公司拟通过发债或在证券市场首次公开发行股份以募集资金；

(l)　　审议批准合资公司经营管理层的年度考核方案及考核结果；

(m)　　聘任或解聘合资公司的审计机构和董事，并决定其报酬事项；

(n)　　对公司高级管理人员的考核体系及奖惩制度；

(f)　　合资公司为经营需要设立分支机构；及

(g)　　员工期权激励方案。

8.4　　除非法律对表决权有更高比例的强制性要求，股东会的高级决议应经持有合资公司 70%及以上表决权的股东同意后方视为已经通过股东会批准。

8.5　　股东会的召集

股东会应由董事长作为会议主席召集并主持。股东会每年至少召开一次，年度股东会应在合资公司财务报告审计后三个月内召开。第一次股东大会

应由公司持股最多的股东的代表召集并主持。股东可以书面授权的方式委派其他人代表其出席股东大会。

股东会决议的法定人数：除非法律对法定人数有更高的强制性要求，就普通决议而言，股东会的法定人数应为出席会议持股总和不低于 70%当时已发行股份的股东。

8.6    书面决议和电话会议

受制于适用法律的规定，合资公司的公司章程应规定，股东可以不必召开股东大会就通过有效和具有约束力的决议（对于本合同第 8.1 款（普通决议）和 8.3 款（高级决议）），前提条件是（i）采用书面传签方式或以召集会议的方式进行表决的建议应获得董事长的批准；（ii）只适用于股东会以普通决议的方式通过的事项；（iii）所有股东以书面形式表示同意该决议。会议也可以通过电话形式合法地召集和举行，电话会议的表决机制将在公司章程中规定。

9.    董事会

9.1    董事会的设立

合资公司应设董事会，董事会由三（3）名董事组成，其中二（2）名董事由甲方委派，一（1）名董事由乙方委派。公司事务的整体控制和管理由公司董事会负责。

每一名董事任期三（3）年，经原委派方重新委派可以连任。一方有权自行决定更换其委派的任何董事。若某一董事因退休、辞职、生病、丧失行为能力或死亡、或者被撤换而导致该职位空缺，原委派该董事的一方应重新委派一位继任董事，其任期为该董事任期内剩下的时间。

董事长由甲方委派的一位董事担任。董事长为公司的法定代表人。当董事长因任何原因无法履行其职责时，董事长应依照本合同以及公司章程的规定在董事中指定授权代表临时履行其职责。

一方委派的董事必须为正直、诚信，并具有相应的工作经验的个人。董事应符合相关法律有关董事资格的规定。委派董事的一方应在委派或撤换董事时书面通知另一方。在签署本合同的同时，双方应书面通知对方该方所

委派的初任董事的姓名、职务以及国籍。每一位新董事候选人的履历以及资格情况的简介也应附于委派通知之后。董事会秘书应将委派董事或撤换董事的事宜在公司的记事簿中记录。

董事无需对其在履行职责过程中或执行董事会分配的任务过程中本着诚信原则实施的行为承担个人责任，但是该行为属于故意的不当行为、触犯相关法律、公司章程的行为和/或违反良好职业准则的除外。

9.2    董事会的职权

董事会有权决定公司相关的所有事务，但不包括本合同 8.1 条（必须由股东以普通决议决定的事务）和 8.3 条（需要股东表决批准高级决议的事项）规定需由股东决定的事项。

9.3    董事会会议的召集和表决

董事会每三个月召开一次，可以以各种形式召开。

凡出席人数（含通过视频方式出席）达董事会成员总数 2/3、且至少包含 1 名甲方董事和 1 名乙方董事，则满足董事会会议合法人数要求。若在董事会会议通知的会议时间后 1 小时内仍未满足合法人数要求，该会议将被延期 7 天举行，且第二次会议仍需至少 1 名甲方董事和 1 名乙方董事参加方满足合法人数。

当董事长不能召集会议时，或任意董事无法参见会议，他可以指定董事会中的一员作为他的代理人。代理人的投票将视为其自身的投票。为避免疑问，在适用的相同的时间，一个董事履行一个或多个董事代理人的行为不存在限制。

除非法律对表决权有更高比例的强制性要求，董事会决议应经所有参会董事表决通过方可批准。

9.4    书面决议和电话会议

受制于适用法律的规定，合资公司的公司章程应规定，董事会可以通过书面决议，前提条件是（i）采用书面传签方式或以召集会议的方式进行表

决的建议应获得董事长的批准；（ii）全体董事书面同意通过该决议。会议也可以通过电话形式合法地召集和举行，电话会议的表决机制将在公司章程中规定。

## 10. 运营和管理

### 10.1 管理制度

合资公司采取的管理体制为董事长向董事会汇报并在董事会的督导下工作，其它高级管理人员向董事长汇报并在董事长的督导下工作。在董事会的领导和掌控下，董事长应监督和掌控公司的所有资产、业务和事务。

### 10.2 高级管理人员和管理人员

管理人员应为人正直诚信，并有相应的专业资格及经验。首任董事长由甲方提名，高级管理人员设首席执行官（CEO）、销售总监、财务总监、人力资源总监、生产总监，首席执行官由董事长兼任，任期为四（4）年，可连选连任。管理人员设公司秘书、出纳，均由董事会任命。双方提名或免除有关高级管理人员时应充分考虑到另一方的意见。

董事长应就重大决策向各总监征求意见。总监应按照董事长的要求协助其开展工作。董事长和总监应全职履行各自的职责，除已明确向合资公司董事会报备在其或其关联方所担任的名义职位外，不得在任何其他经济实体中兼任董事长或总监。

### 10.3 董事长职责

董事长应负责执行董事会的决定，以及合资公司的日常运营和管理事项。董事长应向董事会负责，并根据董事会赋予他的权力履行职责。董事长有权自行雇用和解雇除合资公司高级管理人员之外的其他员工，并指定特定人员就公司经营状况向股东指定人员定期报备。董事长有权决定合资公司的内部运营结构，并应指派适当的部门经理/总监负责各自部门的工作。其他高级管理人员和前述被指派的各总监应向董事长报告工作，并在其监督和领导下工作。所有的采购订单、发票、合同、协议和其他对合资公司有约束力的商业和法律文件应根据授权体系批准并签署。



11.　市场、销售和采购

11.1　配额

如美国未来对 HFCs 产品实施配额制,合资公司设立前甲方及其关联方以其累积的销售量应获得的 HFCs 产品配额归甲方所有,合资公司设立后以合资公司名义累积销售量应获得的 HFCs 产品配额归合资公司所有。合资公司在经营中应优先使用合资公司拥有的配额,合资公司的配额用尽后方可使用甲方及其关联方的配额。当甲方及其关联方配额超出合资公司当年正常销售的需求时,双方应讨论合资公司是否就甲方及其关联方当年剩余的配额建立库存,若乙方不同意建立库存,则甲方及其关联方可自行在其剩余的配额范围内建立库存,但因其自行建立库存未来将与合资公司根据本合同规定发生业务冲突时双方需另行协商解决。甲方关联方在使用配额时应优先采购乙方的产品。

11.2　其他资产的利用

合资公司成立后,合资公司将以市场公允价格和和条件租赁甲方或其关联方(为本条起见,不含 T.T. International)名下所有的与致冷剂经销相关的有形资产(包括土地、厂房、车辆和设备等);

在合资公司成立后的适当时机,合资公司应以市场公允价格和条件收购甲方或其关联方名下的上述有形资产及空钢瓶。

11.3　市场和销售政策

董事长应负责制订合资公司的营销政策及策略,并报请董事会批准。合资公司的所有营销活动都应依照上述批准的营销政策及策略进行。

11.4　合资公司的产品和服务的市场

合资公司可以在美国境内,及在国际市场上出售合资公司的产品,并提供相关服务。

11.5 采购政策

合资公司应依照董事长不时制订并经董事会批准的采购政策，充分考虑产品的质量、数量、价格及运输条件等，采购其需要的设备、软件、材料、运输工具、办公用品及其他物品。

12. 不竞争，不招揽和不贬低

甲方在此向乙方承诺并约定，除非乙方书面同意，在合资公司成立后，不会从事以下任何行为：

(a) 除合资公司的运营，直接或者间接、单独或与他人一起、或协助他人运营、经营、管理、控制或参与任何涉及目标产品的研发、生产、经销、推广或营销目标业务或与目标业务直接或间接竞争的任何业务，或在上述任何该等业务中拥有股权或有分享收益的权利；

(b) 直接或间接、单独或与他人一起、或协助他人，鼓励或者煽动：

(i) 乙方或公司与业务有关的任何客户、经销商或供应商拒绝与乙方或公司继续交易，或拒绝按照惯常与乙方或公司交易的标准条款进行交易；

(ii) 乙方或公司的任何董事、管理人员或员工不再为乙方或公司工作；

(c) 直接或间接、单独或与他人一起、或协助他人，以与乙方或公司相竞争的方式：

(i) 与乙方或公司与业务有关的客户、经销商或供应商进行交易、或寻求与之进行交易；

(ii) 聘用乙方或公司的任何董事、管理人员或雇员，或向其发出聘用要约，或招揽该等人士；

(d) 公开贬低或损害乙方或公司。

13. 技术和知识产权

13.1 合资公司的知识产权

(a) 在合资公司日常经营活动过程中产生的或由合资公司开发的任何知识产权（由一方或第三方所有或许可的除外）应由合资公司所有。各方同意相互协作，促使合资公司的高级管理人员及其他工作人员



确立相应制度，对所有由合资公司雇员开发的相关知识产权均以合资公司的名义进行确定、申请及/或登记。

(b)　各方应尽力促使所有合资公司的雇员签署标准劳动合同，其中应包括惯常的、合理的及统一的竞业禁止及发明转让条款，以尽可能地确保在相关法律允许范围内，合资公司雇员的发明及与发明有关的所有利益均应归属于合资公司并且属于合资公司的财产。

## 13.2　商业秘密

在不影响上述规定的情况下，如果任何一方提供给合资公司或提供给另一方的载有商业秘密或保密信息的文件或其他媒介，应在文件或其他媒体中突出标记"严格保密，所含材料不得披露，未经允许不得复制或传送给任何第三方"或者其他类似标记。董事长负责建立适用于合资公司员工的、有关管理和保护商业秘密的内部规章。合资公司与员工签订的所有劳动合同均须设置有关保密义务和商业秘密的条款。

## 14.　劳动管理

14.1　有关合资公司员工的招聘、雇用、解雇、辞职、工资和福利，以及其他有关合资公司员工的事项，应由合资公司按照适用的法律和公司不时制定的政策自主决定，不受外来干涉。原甲方关联方 BMP 名下员工在符合合资公司要求的前提下全部转入合资公司。

14.2　董事长应根据合资公司的业务需求确定雇佣员工的资格和人数。合资公司聘任员工应与其签订集体劳动合同或个人劳动合同。

14.3　合资公司应根据有关劳动保护的适用法律确保安全劳动，文明作业。合资公司应按照适用的法律办理员工的强制性劳动和社会保险。

14.4　合资公司可采取期权激励措施，以累计总期权数不超过公司总股本（按增设期权前的总股本确定）的 10% 为限，新增期权授予骨干员工，该期权无

投票权、不参与分红，仅在公司上市或被收购时兑现。骨干员工遴选条件和名单由每年股东会讨论确定。

15. **财务与会计**

15.1 双方应各自尽其最大努力确保公司：

    (a) 保持适当的会计记录；

    (b) 在最大可能的范围内，避免其经营过程中的所有现金交易；一旦在例外情况下发生任何现金交易，该现金交易必须在公司账簿中适当体现，并有合法的收据和发票支持。

    (c) 在任何一方向公司发出合理的书面通知时，向该方提供其可能合理请求的报告和信息；

    (d) 允许每位公司董事在任何合理时间查阅这些会计记录；

    (e) 依照法律法规建立合资公司的财务、会计制度，并应当在每一会计年度终了时编制财务会计报告，并依法经注册会计师审计，并在与该年度财务会计报告有关的每个会计年度结束后的三个月内将每份年度账目的复印件送交双方。

15.2 双方应确保公司每一会计年度始于1月1日并止于12月31日。合资公司的第一个会计年度应从公司设立之日开始，截止于当年12月31日。

15.3 任一方，只要其持有公司至少10%的股权，应有权随时要求对公司的账本和账目进行审计。

提出审计要求的一方可选择由其自己的内部审计人员或自费聘请的独立注册会计师进行该等审计。公司及双方应给予该等会计师全面合作，该等会计师有权查阅公司的所有账本和记录。

15.4 **利润分配**

合资公司缴纳所得税后，董事会将按照法律，确定税后利润中提取盈余公积金、企业发展基金和法定公益金（用于员工奖励及福利基金）的分配方

案。

(a)  税后利润（扣除上款所述基金后）应按照双方的股权比例进行分配，除非股东会决定将税后利润再投资于合资公司。

(b)  如果合资公司上一年度有亏损，则本年度的利润应首先用于弥补亏损。在所有亏损弥补前，不得分配利润。合资公司留存的上年度未分配的利润，可与本年度的可分配利润一起分配，或者在弥补本年度损失后再进行分配。

利润将按照双方的股权比例进行分配。任何可分配股利应当在上一会计年度结束后的 90 天内付清。

## 16.  乙方的其它权利

16.1  乙方有权向合资公司派遣包括但不仅限于财务、技术及仓库保管等人员；

16.2  乙方有权通过定期报告或实时信息通道了解包括但不仅限于财务、客户、市场、库存等合资公司运营方面的信息。

## 17.  陈述与保证

17.1  相互陈述及保证

任何一方向另一方陈述与保证，其在本合同签订日时：

(a)  该方具备签订和履行本合同的充分权力、授权和批准；

(b)  本合同根据其条款构成该方具约束力的义务；

(c)  对本合同的签订和交付以及对其条款和规定的履行和遵循将不会造成或构成对任何（该方作为缔约方的或对该方有约束力的）协议或文件的违约，也不会违背或违反任何法律、法规或任何法院或政府机构的命令或禁令；且

(d)  其已经向另一方披露任何政府机关颁发的可能会影响其全面履行其在本合同项下义务及双方实现本合同目的的所有文件，并且其提供给另一方的文件不存在不实陈述、虚假陈述或误述或者遗漏。

17.2  甲方关于今后拟出售给合资公司的有形资产的声明、保证及承诺

(a) 甲方或其关联方对该类有形资产具有合法的、完全的所有权，并有权向公司转让该类资产；该等资产或与其相关的任何权利和利益，不受任何抵押权、质押权或第三人对于该类资产的权利主张的限制；公司于资产交付后将享有作为资产所有者应依法享有的一切权利，包括但不限于依法占有、使用、转让和处分该类资产的权利；该类资产并不会因任何适用法律或第三人的权利主张而受到没收或扣压，或者被施加以抵押、留置、质押和其他形式的负担。

(b) 截止资产交付日，甲方对于该类资产的权利行使不会侵犯任何第三人的专利权、版权、商标权或其他知识产权，并无任何第三人提出关于上述权利的权利要求；于资产交付日后，公司对于该类资产的权利行使将不会侵犯任何第三人的专利权、版权、商标权或其他知识产权。

(c) 甲方没有在该类资产上作出任何能够或可能导致在资产交付日后（含资产交付日）于资产上产生有利于第三人的抵押权、质押权或者其他权利和/或利益的任何协议、安排或承诺；

(d) 截至资产交付日，甲方没有获悉任何第三人就交付资产或其任何部分行使或声称将行使任何对该类资产有重大不利影响的权利；亦无任何直接或间接与交付资产有关的争议、诉讼或仲裁；不存在与交付资产相关的任何未缴纳或履行的税务负担和责任。

(e) 于资产交付日前（含资产交付日），该类资产处于良好的运作状态；甲方或其关联方已定期进行适当的保养及维护。

17.3   陈述及保证不实的后果

如果一方做出的上述陈述及保证的任何一项与实际情况有实质性不符，则构成该方实质性违约。

18.   终止、解散及清算

18.1   终止事件

本合同于合资期限届满之日终止。在本合同期限届满前，除本合同另有规定外，如果发生以下情形之一，本合同终止：

(a)   公司清算、解散或者无限期停业；

(b)　公司为债权人利益而执行一般转让，或指定接管人或受托人占有公司的财产和资产；

(c)　根据 1933 年证券法（经修订）表格 S-1 的登记声明，公司正式承诺公开发行普通股股票；

(d)　出售、转让或处置公司的全部或大部分财产或业务，或将公司与其他公司（非全资附属公司）合并，但不适用于专为改变公司住所目的而进行的合并；

(e)　持有超过 70%股份股东的书面一致同意；或

(f)　就任何一名股东而言，根据本合同的条款及条文，当该股东处置其拥有的全部股份后。

(g)　当发生以下情形时，一方（"**通知方**"）可随时向对方发出书面通知，表达其终止本合同的意向，并根据第 17.2 条终止本合同：

　　(i)　乙方未能顺利根据 5.5.4 向甲方转让股份；

　　(ii)　对方实质性违约或者实质性违反公司章程，且未在补救期（定义见下文）内对该违约予以补救；或

　　(iii)　对方破产，或者正在进行清算或解散程序，或者歇业，或者无力偿还到期债务；或

　　(iv)　不可抗力（定义见下文）事件或其影响持续超过六（6）个月，对合资公司的业务、资产或运营有重大负面影响，且双方无法达成一项公正的解决方案。

为免异议，任何一方发出表明终止本合同意向的通知这一行为本身并不构成本合同的终止。如果发生上述情况之一，则除享有其在本合同或相关法律下的权利外，有权发出终止合同意向通知的一方还有权中止履行其在本合同项下的义务，直到有关情况得到解决。

18.2　终止程序

(a)　如果通知方按照第 17.1（g）条发出表明终止本合同意向的书面通知，双方应在该通知发出后三十（30）日内进行磋商，以努力解决导致发出该通知的情形。如果双方未在此三十（30）日（或者双方

书面同意的延长期限）内达成双方满意的一致意见，通知方有权向对方发出书面通知终止本合同。

(b) 　如果本合同终止，则董事会在有实际可能的情况下应尽早召开董事会紧急会议，双方应促使其指派的董事亲自、通过代理人或通过通讯设备参加该会议并在此次会议上投票赞成批准终止本合同的一致决议或以签署在董事间传阅的书面决议代替召开董事会会议（以适用者为准）。

(c) 　在董事会批准终止本合同和合资公司解散后，董事会应向原登记机关提交一份解散申请。如果对方在终止和解散程序中不予合作，则在相关法律允许的情况下，通知方将有权单方向登记机关提交终止和解散申请。

(d) 　在注册机构登记解散申请后，合资公司应按照相关法律规定的有关程序以及以下第 17.3 条的规定进行解散和清算。

### 18.3 清算

(a) 在解散申请按照第 17.2 条的规定得到批准和登记后的十五（15）日内，董事会应指定相关人士组成清算委员会，清算委员会有权在所有法律事宜中代表合资公司。清算委员会应按照适用法律以及本合同所规定的原则履行其职责。

(b) 清算委员会成员对合资公司承担委托责任，并且在履行其职责期间应全面遵守相关法律的规定。除非相关法律另有规定，清算委员会应在协商后以多数票赞成的方式做出决定。

### 18.4 各方持续的义务

以下各条款在本合同终止以及合资公司终止、解散、清算以及注销以后继续有效：第 9 条（董事会）（但仅就董事会被要求在本合同终止后和合资公司注销前采取的行动而言），第 12 条（不竞争，不招揽和不贬低），第 17 条（终止、解散及清算），第 18 条（违约）（但其效力仅限于本合同终止前发生的违约事件以及违反其他持续义务的情形），第 19 条（保





密义务），第 21 条（争议的解决），以及第 1 条（定义和解释）（在解释前述条款所需的范围内）。

19.  **违约**

19.1  **违约补救措施**

除本合同其他条款另有规定外，如果一方（"**违约方**"）未履行其在本合同项下任何一项主要义务或根本违反了本合同，则对方（"**受损害方**"）可：

(a)  向违约方发出书面通知，说明违约的性质以及范围，并且要求违约方在通知中规定的合理期限内（"**补救期**"）自费予以补救；并且

(b)  如果违约方未在补救期内予以补救（或者如果没有补救期，则在该等违约后的任何时间），则除享有相关法律项下的权利之外，受损害方还可就违约引起的直接和可预见的损失提出索赔。

20.  **保密义务**

20.1  **保密义务**

本合同任何一方对其获得的、或披露给其的另一方和合资公司的保密信息负有保密义务。在本合同期限内以及本合同终止后的二（2）年间，接受方必须：

(a)  对保密资料进行保密；

(b)  除本合同规定的使用目的外，不得将保密资料用于任何其它目的；并且

(c)  除为履行其职责而确有必要知悉保密资料的该方或其关联机构的雇员、该方代理、律师、会计师或其他顾问外，不得向任何人（个人或实体）披露保密信息，且上述人员须已签署书面保密协议（合称"**允许披露方**"）。

20.2  **除外条款**

上述第 19.1 条的条款对以下信息不适用：

(a)　　接受方有书面记录证明在披露方向其披露前其已经掌握；

(b)　　目前或将来并非由于接受方违反本合同而进入公有领域；或

(c)　　接受方从对该信息无保密义务的第三方获得。

## 20.3　资料返还

在合同期满日，或经披露方随时提出要求，接受方应(i)向另一方归还或经另一方要求销毁，包含另一方或合资公司保密资料的所有材料（包括其复印件），并且(ii)在另一方提出此项要求后十（10）日内向另一方书面保证其已经归还或销毁上述材料。

## 21.　　不可抗力

### 21.1　不可抗力的定义

"不可抗力"指超出本合同双方控制范围的，不能预见、不能避免或不能克服的所有事件，该事件使得本合同任何一方部分或者完全不能履行本合同。这类事件包括但不限于地震、台风、流行病、洪水、火灾、战争、罢工、暴动、政府行为、法律条文或者其适用发生变化，或者其他任何无法预见、避免或者控制的事件，包括在国际商务实践中通常被接受为不可抗力的事件。

### 21.2　不可抗力的后果

(a)　　如果发生不可抗力事件，一方在本合同项下的义务受不可抗力影响而造成的延误的，在延误期间自动中止履行该义务，并且其履行期限应自动延长，延长期间为中止的期间，且该方无须为此承担违约责任。

(b)　　提出受不可抗力影响的一方应及时书面通知对方，并且在随后的十五（15）日内向对方提供不可抗力发生以及持续期限的充分证据。提出受不可抗力影响的一方还应尽一切合理的努力排除不可抗力的不利影响。



(c)　　发生不可抗力，双方应立即进行磋商，寻求一项公正的解决方案，并且要尽一切合理的努力将不可抗力的影响降至最小。

22.　　**争议的解决**

22.1　适用法律

本协议的订立、解释和执行，以及各方有关本协议的争议的解决均受中国法律法规的管辖。

合资公司的成立及其运行，应遵守美国佛罗里达州有关法律的规定。

本协议中与合资公司有关的事项，如果根据美国佛罗里达州有关法律的强制性规定必须适用美国佛罗里达州法律的，则仅在最少必要的范围内适用美国佛罗里达州法律。

22.2　仲裁

任何因履行本合同或者与本合同有关的争议应提交上海国际经济贸易仲裁委员会（上海国际仲裁中心，"SIETAC"）进行仲裁，以作为最终的解决，仲裁地点在上海。该仲裁应根据在申请仲裁时 SIETAC 届时有效的最新版本的仲裁规则进行，且仲裁的语言为中文。仲裁员应为三人。各方应在收到仲裁委员会的仲裁通知后十四日内指定一名仲裁员，而由双方指定的两名仲裁员应共同指定第三名仲裁员作为仲裁庭的首席仲裁员。如果在收到仲裁通知后二十八日内，一方未能指定其仲裁员，或双方指定的两名仲裁员未能对第三名仲裁员的指定达成一致，则该仲裁员应由 SIETAC 根据其仲裁规则指定。仲裁员不得是任何一方的现任或前任雇员、代理、顾问或律师。仲裁员可从仲裁委员会的仲裁员名单以外的人员中选任。仲裁裁决应基于仲裁员的多数意见并以书面形式做出。

22.3　权利和义务的持续

当某一争议发生并且正在通过友好协商或仲裁解决时，双方应继续行使其各自在本合同项下的其他权利，同时继续履行其各自在本合同项下的其他义务，但与争议事项有关的权利和义务除外。

23.   其它规定

23.1  合同双方间的独立关系

本合同任何条款均不应被解释为或默示为：

(a)    使任一方成为另一方的代理人（另一方事先书面同意的除外）；或

(b)    授权任一方承担另一方的任何费用或其他任何形式的义务（另一方事先书面同意的除外）。

23.2  合同约束范围

本合同对本合同双方及其各自合法的继任者和受让人均有法律拘束力并为其利益订立。

23.3  修订

本合同应经双方签署书面文件后方可修改；若相关法律另有规定，则须签署书面文件并取得相关登记机关的批准，本合同方可修改。

23.4  通知

(a)    本合同规定一方向另一方发出的通知或书面函件（包括但不限于本合同项下所有要约、书面文件或通知）均应以英文和中文制作，并通过以下方式送达相应一方：

(i)     当面递交；或

(ii)    专递信函；或

(iii)   传真。

(b)    在以下时间通知被视为已经送达：

(i)     如果以当面递交方式送达，送达指定地址并签署回执或其他送达证明之时；

(ii)　　如果是以专递信函方式送达，为递交日后的第五个工作日；且

(iii)　　如果是以传真的方式送达，为发送传真方的传真机发送报告确认书（表明已向相关传真号码发送完整的、未中断的传真）上标记的日期的下一个工作日。

(c)　　在合资期限内，一方可随时根据第 22.4 条规定的方式通知另一方变更通知送达地址。

甲方: MENG XIANBIN

通信地址：8105 Anderson Road, Tampa, FL 33634

电话：+1 (813) 443-0757

收件人：MENG XIANBIN

邮箱：Ben@BMP-USA.com

乙方：浙江巨化股份有限公司

通信地址：浙江省衢州市柯城区

电话：+86(570) 3097988

收件人：雷俊

邮箱：fhlj@juhua.com.cn

## 23.5　可分割性

本合同某一条款的无效不影响本合同其他条款的效力。

## 23.6　整体性

本合同及其附件（如有）构成双方就本合同标的达成的全部协议，并取代双方之间此前就该标的进行的所有磋商、谈判以及达成的协议。

**23.7　放弃权利**

如果一方未能行使或迟延行使其在本合同项下的某些权利、权力或特权，不构成该方对此项权利、权力或特权的放弃，如果该方已经行使或者部分行使某项权利、权力或特权，并不妨碍其在将来行使其它权利、权力或特权。

**23.8　费用**

除本合同中另有约定，双方应各自承担其与本合同的制作、谈判及订立相关的律师或其他专业顾问费用，以及其因履行本合同各自义务而各自应缴纳的任何税款或费用。

**23.9　附件**

本合同的附件（如有）为本合同不可分割的部分，并且与本合同正文的条款具有同等效力。如果本合同正文的条款与附件有冲突，以本合同正文条款为准。

**23.10** 本合同自双方签署之日生效，以中文书就，一式拾份，甲方执贰份，乙方执捌份。

【以下无正文，为签署页】



- 33 -

[签署页]

兹证明，双方正式授权的代表已于本合同首页所载日期正式签署本合同。

**MENG XIANBIN**

本人签名：

**T.T International 公司**

签名：

姓名：　　张天骊

**浙江巨化股份有限公司**

签名：

姓名：　　童继红

职务：　　董事